## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PUBLIC EMPLOYEES' RETIREMENT SYSTEM OF MISSISSIPPI, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>    vs.<br><br>ADVANCE AUTO PARTS, INC., THOMAS R. GRECO, THOMAS OKRAY, STARBOARD VALUE LP, and JEFFREY C. SMITH,<br><br>        Defendants. | Case No. 1:18-cv-00212-MN<br>Hon. Maryellen Noreika<br><br>**<u>CLASS ACTION</u>**<br><br>**JURY TRIAL DEMANDED** |

## AMENDED CLASS ACTION COMPLAINT
## FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................... 1

II.     JURISDICTION AND VENUE ................................................................... 7

III.    PARTIES AND RELEVANT NON-PARTIES ............................................ 8

    A.      Lead Plaintiff .................................................................................... 8

    B.      Defendants ........................................................................................ 8

        i.      AAP Defendants ..................................................................... 8

        ii.     Section 20(a) Defendants ..................................................... 10

    C.      Relevant Non-Parties ..................................................................... 11

IV.     OVERVIEW OF DEFENDANTS' FRAUD ............................................... 17

    A.      AAP's Core Business ...................................................................... 17

    B.      AAP Experiences Rapid Growth, Culminating in GPI Acquisition ..................... 18

    C.      As AAP Stagnates, Starboard Takes Notice and Publicly Touts an Ambitious Plan to Accelerate the GPI Integration, Improve Margins by Up to 750 Basis Points, and Boost AAP's Stock Price ................................................................. 20

    D.      Starboard Installs New Board Members, Ousts the Company's CEO, and Appoints Its Hand-Picked Management Team ..................................................... 24

    E.      Following Starboard's Effective Takeover, AAP Claims "Positive" Growth and Announces a Bold Five Year Plan to Maximize Margins and Grow Sales ... 29

    F.      Behind the Scenes, the Company Struggles to Integrate Carquest and Forecasts Negative Sales Growth for 2017 ............................................................. 33

        i.      The Company Fails to Integrate AAP's and Carquest's Legacy IT Systems ...................................................................... 33

        ii.     As IT Issues Mount, Defendants Exacerbate AAP's Problems by Making Drastic Cuts .......................................................... 37

        iii.    In the Face of Persistent IT Issues and a Depleted Labor Force, Defendants Are Consistently Told of Poor Sales, Reduced Margins, and Negative Forecasts .......................................................... 39

i

V.      MATERIALLY FALSE AND MISLEADING STATEMENTS ..................................... 45

        A.      November 14, 2016 .................................................................................. 45

        B.      February 21, 2017 ................................................................................... 47

        C.      May 24, 2017 .......................................................................................... 51

        D.      Defendants Violated Item 303 of SEC Regulation S-K .......................... 56

VI.     THE RELEVANT TRUTH EMERGES: ALLEGATIONS OF LOSS CAUSATION .... 57

        A.      May 24, 2017 .......................................................................................... 58

        B.      August 15, 2017 ...................................................................................... 59

VII.    ADDITIONAL ALLEGATIONS OF SCIENTER ................................................ 63

        A.      Defendants' Actual Knowledge of the Company's Declining Sales and Margins
                in 2016 and 2017, and Negative Forecasts for 2017 ............................... 63

        B.      The Fraud Concerns the Core of AAP's Operations ............................... 68

        C.      Defendants' High-Level Positions .......................................................... 68

        D.      The Individual Defendants Controlled the Contents of the Company's Public
                Statements During the Class Period ........................................................ 69

        E.      Defendants Were Motivated by Financial Gain ...................................... 70

        F.      AAP Revised Its FY17 Guidance ........................................................... 71

        G.      Terminations of High-Ranking Personnel .............................................. 72

VIII.   ADDITIONAL ALLEGATIONS OF CONTROL ............................................... 72

IX.     CLASS ACTION ALLEGATIONS .................................................................. 77

X.      THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES .......... 79

XI.     THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE
        ARE INAPPLICABLE .................................................................................. 80

XII.    CAUSES OF ACTION ................................................................................. 81

XIII.   PRAYER FOR RELIEF ................................................................................ 84

        JURY TRIAL DEMANDED ............................................................................. 85

## KEY TERMS

| Term | Meaning |
| --- | --- |
| Advance Auto or AAP or the Company | Advance Auto Inc. |
| AOP | AAP's Annual Operating Plan |
| Blue | Internal nickname for Carquest stores' and distribution centers' distinct legacy IT system |
| Claw Back Spreadsheet | A spreadsheet, personally created by Greco, which calculated, among other things, how many additional sales were needed to get back to AOP |
| Class Period | November 14, 2016 through August 15, 2017 |
| Comp store sales | Comparable Store Sales |
| DC | Distribution Center |
| DIFM or Professional | Professional installer customers |
| DIY | "Do-it-yourself" retail customers |
| DM | District Manager |
| FE(s) | Former employee(s) of AAP |
| Finance Team | AAP's FP&A team, with primary responsibility for forecasting |
| FY17 Guidance | AAP's 2017 Full Year Assumptions, which Defendants offered to investors in November 2016, and reaffirmed in February 2017 |
| Greco Forecasts | A second, more aggressive set of forecasts, generated by Operators at Greco's command |
| Integration Meetings | Monthly meetings, attended by SVPs and others, to discuss the GPIO integration's progress |
| Red | Internal nickname for AAP stores' and distribution centers' distinct legacy IT system |

| Term | Meaning |
|---|---|
| Results Meetings | Weekly in person meetings with Greco, Okray, and other executives, at which attendees discussed sales performance, trends, and the reasons for the Company's negative results, held on Mondays in the Company's Raleigh, North Carolina office |
| RVP | Regional Vice President |
| RVP Call | Weekly call between SVPs and their respective RVPs to discuss sales and target, held at 10 am on Mondays |
| Starboard Agreement | Agreement with Starboard to implement a host of changes to meet the activist investor's demands, announced November 12, 2015 |
| SVP | Senior Vice President |
| SVP Call | Weekly call with CEO and his team with SVPs to discuss sales and targets |

Lead Plaintiff the Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or "Mississippi PERS"), by and through its undersigned counsel, brings this action individually and on behalf of all other persons and entities who purchased or otherwise acquired the common stock of Advance Auto Parts, Inc. ("Advance Auto," "AAP," or the "Company") between November 14, 2016 and August 15, 2017, inclusive (the "Class Period"), and were injured thereby (the "Class").

Lead Plaintiff alleges the following upon personal knowledge as to itself and its own acts, and upon information and belief as to all other matters. Lead Plaintiff's information and belief is based upon, among other things, the investigation conducted by and through its attorneys, which included, among other things, interviews with numerous individuals, including former employees of AAP ("FEs"), a review of AAP's public documents, conference calls concerning AAP, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by AAP, analyst reports and advisories about the Company, media reports concerning AAP, and information obtainable on the internet. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   INTRODUCTION

1.   Over a period of seven months, Defendants Thomas R. Greco ("Greco"), Advance Auto's Chief Executive Officer ("CEO"), and  Thomas Okray ("Okray"), Advance Auto's Chief Financial Officer ("CFO"), propped up the Company's stock price by publishing guidance for 2017 ("FY17 Guidance") they knew to be unattainable, and which directly contradicted contemporaneous forecasts prepared for the business.

2.   Greco and Okray were among a slate of handpicked executives installed by activist investor Starboard Value LP ("Starboard"), which a year earlier had acquired a $460 million stake

in Advance Auto and publicly pronounced it could turn the Company around.  Starboard claimed that, if given the opportunity to install its own slate of managers and directors, it could double AAP's stock price to more than $350.  Buying in, Advance Auto's board of directors (the "Board") quickly capitulated. By April 2016, Jeffrey C. Smith ("Smith"), Starboard's CEO, took over as Chairman of Advance Auto's Board and installed Greco, a former potato chip executive from Frito-Lay, Inc., as the new CEO.

3.      The honeymoon, if it existed at all, did not last long. Smith and Greco ignored the internal projections prepared by Advance Auto's experienced Finance Team, and invented an earnings scenario not supported by the actual facts on the ground. That scenario was a top down C-suite fallacy, a set of targets with no basis in reality.  Based on these targets Greco and Okray reaffirmed the FY17 Guidance again and again, despite overwhelming evidence that meeting it would be impossible.

4.      On August 15, 2017, Defendants finally rescinded the false guidance that had propped up Advance Auto's stock price for months.  As the truth about AAP's financial performance and the status of Defendants' purported turnaround was revealed, its stock collapsed, losing more than 20% of its value on August 15, 2017. Through this lawsuit, Lead Plaintiff seeks to recover the resulting investment losses borne by it and the putative Class.

5.      AAP is a leading automotive aftermarket parts provider in North America that serves both professional installers ("DIFM" or "Professional") and "do-it-yourself" ("DIY") retail customers.  Since 2008, the Company has invested significantly in increasing Professional sales— by far the most lucrative part of its business—at a faster rate, fueled in large part by a series of major acquisitions.

6.     On October 16, 2013, in its highest profile addition to date, Advance Auto announced that it was acquiring General Parts International, Inc. ("GPI"), a privately held company specializing in the Professional space, for $2.04 billion. The move was immediately heralded as "transformative"; a "game changing acquisition, which, by combining the #3 [AAP] and #4 [GPI] player in the industry by sales, *immediately creates the market leader*."[1] Following the announcement, Advance Auto's shares rose as much as 24%, reaching a then-all-time high.

7.     Despite the market's initial enthusiasm, the synergies Advance Auto hoped to realize from the acquisition failed to materialize. From 2014 through most of 2015, the Company's comparable store sales ("comp store sales") and operating margins—its two most closely watched metrics—stagnated and even declined.

8.     Internally, the reasons for the stagnant growth were widely understood as tied to the struggle to consolidate the IT operations of the new acquisition's crown jewel—Carquest—with those of Advance Auto.  According to FEs, Advance Auto's and GPI's extensive computer infrastructures were completely incompatible. Work-arounds that aimed to achieve synergies in inventory management and supply chain failed.  In September 2015, two years after the acquisition, Advance Auto was still struggling to reap the benefits of the GPI deal, and its stock price had sunk from the slowdown in its year-over-year ("YOY") growth.

9.     Then—fresh off a string of takeover successes and sensing an opportunity for a quick profit—activist investor Starboard began its coup. On September 30, 2015, it announced it had acquired a 3.7% stake in the Company, worth roughly $460 million. Led by its CEO Jeffrey Smith—dubbed the "most feared man in corporate America"—Starboard laid out an ambitious plan to accelerate the GPI integration, slash costs, and improve margins by 600 to 750 basis points.

---

[1] Unless otherwise noted, all emphasis is added.

Starboard also promised to return significant capital to shareholders in the form of stock buybacks and dividends. Investors were once again swooned. Following Starboard's announcement, shares of AAP soared nearly $20, or 11%.

10.     Over the next year, Starboard set about taking control of AAP's management. It installed Smith as Chairman of the Board, along with four additional handpicked Board members. The Company's former CEO, President, and CFO were pushed out, and Starboard installed its own executives, including Defendants Greco and Okray.

11.     But the problems plaguing Advance Auto were not susceptible to the quick fix that Starboard envisioned when it sought control of the Company.  Over a year into its investment and six months after taking control of Advance Auto, the Company reported successive quarters of disappointing earnings and negative comp store sales.  By November 4, 2016, AAP's stock had declined over 20%, to approximately $135 per share, since a year earlier when Starboard had made its investment at approximately $171 per share.

12.     Eager to turn a profit on Starboard's large investment and reverse AAP's sagging stock price, Defendants looked to change the narrative surrounding the Company. On November 14, 2016, the first day of the Class Period, Okray announced to the market, unequivocally: "***[f]or 2017, we will deliver positive sales comp growth and a modest increase on operating margin.***" Greco later exclaimed: "***we're excited about our comp prospects for the next year, very excited about it***." Defendants further promised ***500 basis points*** of margin expansion—or $500 million in gross productivity—by 2021. Greco added, "the bottom line here is that our changes are leading to increased sales, lower costs, lower inventory levels, and higher customer satisfaction."  The market was immediately impressed. AAP's stock shot up nearly 15% on this news.

4

13.     Three months later, Defendants reaffirmed their promise to the market. On February 21, 2017, Defendants promised comp store sales growth of ***up to 2%*** and ***35 basis point improvement*** in operating margin. Despite the Company's lackluster results, which were reported at the same time, investors were assuaged by Defendants' full year assumptions. The message was clear: Defendants had a clear path to deliver results.

14.     But the promise of a turnaround was a mirage. Indeed, as multiple FEs have revealed in the course of Lead Plaintiff's investigation, the GPI integration was marred by setback after setback. Most critically, with no way for AAP's and GPI's IT systems to speak with one another, and no plan in place for how to rectify the problem, the Company struggled to get parts to customers on time and to maintain appropriate inventory levels in its distribution centers ("DCs").

15.     Rather than reckoning with the technical challenges facing the Company—which required millions of dollars of IT investment—Starboard insisted on dramatic cost cutting in an effort to quickly juice margins, but which could not deliver the increased sales they touted to the market.  It made drastic labor cuts, and took away Company phones and cars. Stores that were not meeting their sales targets were told to send people home without pay. DCs were undermanned. Resources were so strained that sales managers were forced to make deliveries themselves. With AAP's work force depleted and brand eroding, disenchanted customers left en masse in 2016 and throughout the Class Period.

16.     Starboard's cost cutting exacerbated sales declines—a fact which was immediately apparent in the internal projections. In August 2016, the Company's own Finance Department was forecasting gross sales growth of ***negative 3%*** for 2017. The forecasts, along with others, were shared with Defendants during weekly "Results Meetings." By December 2016, the Finance

Department's forecasts had dropped to **negative 4% to 5%**. The Company never recovered during the Class Period.

17.     Unsurprisingly, as numerous FEs have confirmed, the Company's performance leading up to and during the Class Period was abysmal:

- According to Greco's personally created "Claw Back Spreadsheet", which calculated how many additional sales were needed to get back to Advance Auto's Annual Operating Plan ("AOP") all Regional Vice Presidents ("RVPs") were in "**Negative Comp Status**" during 2016 and 2017. (¶ 140)

- Quarterly forecasts showed that by 4Q16, the Company was missing its operating margin target by the **largest gap** as compared to any point earlier in the year, and continued to miss its margin AOP by **double digit basis points** into the first and second quarters of 2017 ("1Q17" and "2Q17," respectively). (¶ 142)

- One commercial sales manager's territory alone—which included parts of Ohio, Pennsylvania and New York—was **$20 million below AOP** going into March 2017. (¶ 152)

18.     Nonetheless, in the face of these facts and actual internal projections, Starboard, Greco, and Okray continued to mislead the market. They insisted that their turnaround was working and the Company would deliver on its FY17 Guidance.

19.     By the time the Company reported its 1Q17 results on May 24, 2017—including comp store sales of **negative 2.7%**—analysts began to query how they reconciled with the optimistic guidance laid out in November 2016 and February 2017.  In response, Defendants lied. They blamed their poor results on the "weather," and assured investors they had "**seen a dramatic improvement in our comps**" over the past several weeks. But as one FE, an RVP, explained, "**[w]hatever they said to Wall Street was not real**."

20.     What's more, when analysts pressed Defendants on the FY17 Guidance, Defendants reaffirmed that Advance Auto would meet them. Greco said their guidance "**stands as we sit here today**," and Okray maintained, "**[w]e're not going to change guidance in fiscal year '17**." Although the poor first quarter performance was a manifestation of the misleading guidance

issued in November and February, and the stock fell 5.4%, or $7.64, in response to the guidance miss, Defendants continued to mislead the markets and reassure investors.

21.     Indeed, at the time Defendants were reaffirming their February guidance in May, it was being acknowledged internally that Advance Auto's earnings were a "disaster," according to a senior FE.  So much so that it prompted a Board meeting during which time the Board pressed Greco and Okray on whether the Company should revise its guidance given the internal projections. The Company did not.

22.     Just three months later, facing another quarter of dismal results, Defendants were forced to finally revise their false guidance.  They revealed that comp store sales for 2017 would in fact be *negative 1% to 3%*, and margins would *decrease by 200 to 300 basis points*. In explaining the miss, Greco did not mince words: "*[w]e lacked a coherent strategy*. Our frontline turnover was *unacceptable*. Our technology platforms were *segregated and difficult to navigate*. And our supply chain infrastructure was *duplicative and siloed*."

23.     As the market absorbed the reality that the purported rapid turnaround promised by Defendants in November 2016, reaffirmed in February 2017 in the optimistic guidance that the Company issued, and again endorsed in May 2017, was illusory, Advance Auto's stock collapsed. On August 15, 2017, the market erased $1.64 billion in market capitalization, falling from $109.32 to $87.08, or 20%.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78n(a), and the rules and regulations promulgated thereunder, including SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

25.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and under 28 U.S.C. § 1331.

26.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) because Defendant Advance Auto Parts, Inc. is incorporated and conducts business in this District.

27.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

### III.     PARTIES AND RELEVANT NON-PARTIES

#### A.     Lead Plaintiff

28.     Lead Plaintiff Public Employees' Retirement System of Mississippi purchased shares of Advance Auto common stock at artificially inflated prices during the Class Period and suffered losses as a result of the conduct complained of herein.  Lead Plaintiff's Class Period transactions in Advance Auto common stock are reflected on the certification attached hereto as **Exhibit A**.  On November 2, 2018, this Court appointed Mississippi PERS as Lead Plaintiff for this litigation.

#### B.     Defendants

##### i.     AAP Defendants

29.     Defendant Advance Auto is a Delaware corporation with its principal executive offices located at 5008 Airport Road, Roanoke, Virginia. The Company also maintains a corporate headquarters in Raleigh, North Carolina. AAP is a leading automotive aftermarket parts provider in North America that serves DIY and Professional customers.  The Company's stores sell, among other things, original equipment manufacturer and private label automotive replacement parts, accessories, batteries, and maintenance items for domestic and imported cars, vans, sport utility

vehicles, and light and heavy duty trucks. Advance Auto's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "AAP."

30.     As of December 31, 2016, Advance Auto operated more than 5,000 stores primarily under the trade names "Advance Auto Parts," "Autopart International," "Carquest," and "Worldpac." As of December 31, 2016, AAP's 4,881 Advance Auto and Carquest stores accounted for more than 96% of the Company's total stores. For fiscal years 2016 and 2017, respectively, Advance Auto reported total net sales of $9.57 billion and $9.37 billion. During the Class Period, Advance Auto's market capitalization value reached a high of $13 billion on December 7, 2016, before falling to just $6.4 billion on August 15, 2017.

31.     The Company is organized into three Divisions: North, South, and West (the "Divisions"). During the Class Period, one Division Senior Vice Presidents ("SVPs") supervised each Division: Mike Pack (West), Dave McCartney (South) and Jim Durkin (North). The SVPs in turn had oversight responsibility over 34 Regional Vice Presidents ("RVPs"). The 34 RVPs oversaw several hundred District Managers ("DMs") nationwide.

32.     On January 2, 2014, Advance Auto announced that it had completed the acquisition of GPI. According to Advance Auto's press release announcing the closing of the acquisition, GPI was "a leading privately held distributor and supplier of original equipment and aftermarket replacement products for commercial markets operating under the CARQUEST and WORLDPAC brands." Through the acquisition, Advance Auto added to its operation "38 [GPI] distribution centers, 1,248 company operated CARQUEST locations across the US and Canada," and "approximately 1,400 independently owned CARQUEST locations primarily in the US and Canada." Additionally, Advance Auto added WORLDPAC, "a leading importer and distributor of original equipment and quality aftermarket replacement automotive parts to import specialists

in North America and Puerto Rico operating 105 facilities across the US and Canada," as part of the acquisition.

33.     Defendant Greco was, at all relevant times, the Company's President and CEO. He has been Advance Auto's President since August 14, 2016, and the Company's CEO since April 11, 2016. Before joining Advance Auto, Greco served as the President and CEO of Frito-Lay North America, Inc., and the President of Frito-Lay, Inc., from September 2011 to March 2016.

34.     Defendant Okray was, at all relevant times, the Company's Executive Vice President ("EVP") and CFO. Okray was Advance Auto's EVP and CFO from October 31, 2016 to April 15, 2018, before moving on May 2, 2018 to W.W. Grainger Inc., where he serves currently as CFO.

35.     Hereinafter, Defendants Greco and Okray are collectively referred to as the "Individual Defendants." The Individual Defendants and Advance Auto are collectively referred to as "Defendants."

### ii.     Section 20(a) Defendants

36.     Defendant Starboard is a New York-based hedge fund who, during the Class Period, owned more than a 3.7% stake in Advance Auto. Starboard's principal place of business is 777 Third Ave., New York, New York 10017. According to its website, Starboard "invests in deeply undervalued companies and actively engages with management teams and boards of directors to identify and execute on opportunities to unlock value for the benefit of all shareholders."

37.     Defendant Jeffrey C. Smith is Managing Member, Chief Executive Officer, and Chief Investment Officer of Starboard. Smith became a member of Advance Auto's Board of Directors in November 2015 and has served as Chair of the Board since May 2016. In that role, Smith maintains a presence in the Company's Raleigh, North Carolina office.

10

38.     Hereinafter, Defendants Starboard and Smith are collectively referred to as the "Starboard Defendants."

### C.     Relevant Non-Parties

39.     FE 1 was a Senior Financial Planning & Analysis ("FP&A") Analyst with Advance Auto from June 2017 through the Class Period. FE 1 also had responsibility for the Company's forecasting. In those capacities, FE 1's responsibilities were to prepare the slide decks for weekly Monday meetings, lasting from noon to approximately 3:00 or 4:00 p.m., in which the C-suite reviewed performance numbers ("Results Meetings"). Those slide decks contained daily and monthly sales numbers for stores, YOY variances, projections, and comparisons against the numbers of Advance Auto's competitors. FE 1 worked under FP&A Director Michael Keating, who, at Okray's direction, led the Results Meetings, and reported directly to Greco and Okray.

40.     FE 2 was an FP&A Analyst with Advance Auto from before the Class Period through 3Q17 at the Company's corporate offices in Raleigh, North Carolina. FE 2 was a member of the Finance Group. FE 2's team supported internal departments (such as supply chain and merchandizing) from a finance perspective. FE 2's subgroup also participated in developing Advance Auto's AOP. FE 2's team produced Quarterly Margin Forecasts in a report format which incorporated information obtained through the year and compared it to the AOP, which was established at the beginning of the year.

41.     FE 2's team reported information on the Company's missing of its margin plan to management, including Alan Lawson, a Director of Finance Support; the Vice President ("VP") of Pricing and Merchandising; and Charles Tyson, the EVP of Supply Chain Merchandising, who reported to Greco. In day-to-day conversations with the Director of Finance and other management personnel, FE 2 was involved in discussions regarding necessary internal restructuring as a result

11

of the Company's poor performance, including anticipated layoffs. During the Class Period, FE 2 worked under Alan Lawson, a Director of Finance Support.

42.     FE 3 was a Vice President of Sales & Operations at Advance Auto prior to the Class Period and through Spring 2017 for stores located in both Eastern and Western areas of the United States. During that time, FE 3 also held a supervisory position in Store Operations at Advance Auto. FE 3 reported to Mike Pack, who reported directly to Greco and Okray. FE 3 received FE 3's sales target numbers from Mike Pack, who received them directly from the C-suite. FE 3 and others argued with the C-suite over the unreasonable sales target numbers generated by the C-suite.

43.     FE 4 was a Program Manager with Advance Auto from September 2010 through October 2017. In that capacity, FE 4 worked closely on the GPI integration, and presented at monthly meetings with SVPs to discuss risks, mitigation of those risks, and updates on different parts of the GPI integration project ("Integration Meetings"). C-suite executives attended those meetings. FE 4 reported to Allison Bubar, Director of Integration & Strategy, who reported to Bill Carter.

44.     FE 5 was a Commercial Sales Manager with Advance Auto from mid-2016 through late 2017. In that capacity, after the integration began, FE 5 was responsible for parts of three states: Pennsylvania, Ohio, and New York. FE 5 managed approximately 11 Sales Representatives who reported directly to FE 5. In early 2017, FE 5 experienced, first hand, issues with the Company's deliveries.  In or around February 2017, FE 5 attended meetings that included C-suite executives, such as Greco, and Smith, where FE 5 raised those same concerns again and was ignored. The meetings would instead be focused on the Company's stock price.

45.     Moreover, every three months, FE 5 received sales targets, which constantly increased, that were set by the C-suite. FE 5 felt sales targets were set so poorly, there was no way they could be overcome. FE 5 discussed those targets with FE 5's colleagues and counterparts in the Company's other regions, and found that their experiences matched FE 5's.

46.     FE 6 was a Director of Supply Chain with Advance Auto from early 2015 through June 2017. FE 6 was a member of the Technology & Automation team. FE 6's team worked on elements of the integration including IT. In those capacities, FE 6 was responsible for all IT systems in warehouses including, but not limited to, hardware and software automation. FE 6 was directly involved in the integration efforts, including the Company's attempt to convert Carquest to Advance Auto's IT system and to convert both Carquest and Advance Auto to an entirely new system. FE 6 participated in monthly Integration Meetings with VPs and SVPs to discuss the status of the integration. The substance of these meetings was communicated by the SVPs to the C-suite. When FE 6 left, in June 2017, the integration was not targeted to be completed until January 2018. FE 6 reported to the SVP of Supply Chain, Todd Greene.

47.     FE 7 was a Senior Business Analyst with Advance Auto from June 2016 through March 2017 in the Raleigh, North Carolina office. FE 7's team of analysts dealt with the integration issues that arose "all day, every day." FE 7's responsibilities included preparing forecasts by reviewing sales figures from both the AAP and Carquest systems, which were different. FE 7 focused on the Company's brakes and engine management segments. All analysts and finance teams had access to those systems. FE 7 met weekly with other team members and Kelly Dickens to review the Company's forecasts and sales numbers. FE 7 reported to Kelly Dickens, Senior Manager of Merchandise Planning, who reported to Jaime Olson, Director of Merchandise Planning.

48.     FE 8 was a Senior Finance Executive at Advance Auto's office in Raleigh, North Carolina from before the Class Period through mid-2017. FE 8 had a key role in sales forecasting and financial planning, and as such had visibility into the Company's Sales, Marketing, E-Commerce, and Supply Chain segments, among others. FE 8 was directly responsible for creating short- and long-term financial sales goals, as well as analyzing related sales metrics and other analytics. FE 8 personally prepared the sales forecasts, which were generated through a "bottoms up," algorithm-based approach, by which past sales trends and other data would be used to predict future sales ("Finance Forecasts"). FE 8 reported to Kevin Quinn, VP of Finance, who reported to Okray.

49.     FE 9 was an RVP in the South Division at Advance Auto from before the Class Period through mid-2017. In that capacity, FE 9 was one of 34 RVPs. According to FE 9, the chain of command at Advance Auto was Smith (Starboard), then Greco, then Division SVPs, then RVPs, then DMs. Every Monday, the SVPs had a call with the CEO and his team to discuss Sales and targets ("SVP Call"). After that call, the SVPs prepared decks for calls with each SVP's respective RVPs at 10:00 am ("RVP Call"). Later in the day, the RVPs would have a call with the DMs. During the RVP Call, FE 9 and the other RVPs would be given a "Claw Back Spreadsheet," personally created by Greco, which calculated how many additional sales were needed to get back to AOP. During 2016 and 2017, all RVPs at the Company were missing their targets. FE 9 also had access to and visibility into Advance Auto's sales systems, called "Dashboard" and "Ignite," which confirmed this. FE 9 reported to SVP David McCartney, who reported to Greco.

50.     FE 10 was an RVP for the North Division at Advance Auto from before the Class Period through Spring 2017. As an RVP, FE 10 was responsible for the sales and operations of over 100 stores in the North Division. Personally, FE 10 reviewed the performance of 15 Division

14

Managers, each managing 15-20 stores. FE 10 participated in conference calls, attended by executive management, including Greco, to discuss sales goals, and, specifically, why they had not been met. On those calls, Greco spoke of his daily review of all 34 Regions' sales numbers. FE 10 reported to the President of the North Division, Jim Durkin, and later to his replacement, Mike Creedon, both of whom reported to Greco.

51.     FE 11 was a Director from before the Class Period through 1Q17 with responsibility for certain components of the GPI acquisition. Specifically, FE 11 was responsible for the commercial business integration and the integration of all Carquest stores. FE 11 reported to Vice President of Field Integration Mike Fogarty.

52.     FE 12 was an RVP at Advance Auto from mid-2016 until mid-2017 with responsibility for hundreds of stores in the West Division. FE 12 reviewed the Company's daily sales reporting, which included metrics such as comp store sales increases, and the Company's current results compared to the corresponding period for the prior year. The CEO and CFO accessed that same information. FE 12 had insight into the integration's high costs and requirement of manual fixes. FE 12 reported to President Mike Pack, who reported to Greco.

53.     FE 13 was a Field Process Manager at Advance Auto from before 2010 until December 2017. FE 13 was directly involved in the acquisition of Carquest. In that capacity, FE 13 experienced severe issues with the integration and communicated them to superiors, including the C-suite.  FE 13 reported to Mike Fogarty, VP of Field Operations.

54.     FE 14 was a Supply Inventory Planner at Advance Auto from 2015 through the Class Period in Raleigh, North Carolina. In that capacity, FE 14 was responsible for, among other things, supply chain issues related to the integration. For example, on one occasion, FE 14 looked into a situation wherein an Advance Auto store in Bangor, Maine could not pull products from a

Carquest DC that was 1.2 miles away. Instead, it had to pull from an Advance Auto DC that was 416 miles away.

55.     FE 15 was employed by AAP for more than 10 years, including as an Asset Protection Manager from the beginning of the Class Period through 2Q17. In that capacity, FE 15 was responsible for more than 200 stores, overseeing, among other things, issues of inventory and shrinkage related to the integration. FE 15 attended meetings, including one in March or April 2017 in Charlotte, North Carolina, which included all other Asset Protection Managers and Mike Cox, SVP of Asset Protection.

56.     FE 16 was a Planning Analyst at Advance Auto from 2015 to 2017. In that capacity, FE 16 worked to convert the Carquest stores to Advance Auto stores.  FE 16's responsibility was to ensure the Company's stores had adequate inventory. FE 16 did this by tracking the sales of parts. FE 16 attended town hall meetings led by Greco.

57.     FE 17 was a DM at Advance Auto from prior to the Class Period through 3Q17 in the Midwest Region of the United States. FE 17 had access to sales reporting for the Region. FE 17 discussed Company-wide sales declines with other DMs. In November or December 2016, FE 17 attended a meeting of all 12 Regional DMs and RVP Jason Hand to discuss 2017 sales targets. FE 17's region performed so poorly in 2016 that comp store sales targets were actually negative— something that, in Hand's experience, had never happened before. FE 17 also recalled discussions, which took place during January and February 2017, regarding cost-cutting measures such as cutting phones, cars, and personnel over a four to six month period. FE 17 reported to RVP Jason Hand, who reported to one of three or four Divisional SVPs, who reported to the CEO, CFO, and the Board.

58.     FE 18 was a Store Manager at Advance Auto in Louisiana from mid-2016 to March 2017.

59.     FE 19 served in Financial and Product Analyst roles, at Advance Auto from prior to the Class Period until 3Q17 in Raleigh, North Carolina. In that capacity, FE 19 was responsible for supporting Product Managers in their product acquisitions. FE 19 discussed the status of the Company's sales targets and performance with Category Managers.

60.     FE 20 was a Manager with responsibilities which included pricing and other issues, who started at Carquest and joined Advance Auto as a result of the acquisition, from a period before the start of the Class Period through the end of 2016. FE 20 was also a member of the General Product group. In those capacities, FE 20 led a team of 8-10 pricing analysts. FE 20's team worked with both corporate and field people to set prices.  FE 20 reported to an SVP of Products in Raleigh.

61.     FE 21 was a Sales Manager at Advance Auto from April 2016 to March 2017. In that capacity, FE 21 oversaw several stores in North Carolina. FE 21 reported to DM Chad Simpson.

## IV.     OVERVIEW OF DEFENDANTS' FRAUD

### A.     AAP's Core Business

62.     AAP sells to both DIY and Professional customers. The Company's DIY customers are primarily served through AAP's stores. The Company's Professional customers consist primarily of delivery customers for whom AAP uses a Professional delivery fleet to deliver product from a store or branch location to the professional customers' places of business, including garages and auto dealers.

63.     Since 2008, the Company has invested significantly in increasing Professional sales at a faster rate of growth. As the Company explained in its 2016 10-K, AAP's Professional segment

is its "growth engine," and "serving professional customers requires a high-quality product assortment, delivery service that is fast and consistent, technology to drive growth and the ease of doing business, a sales team dedicated to providing excellent customer service, and training to enable our customers to grow their business." As of December 31, 2016, Advance Auto's sales were approximately 58% to Professional customers and 42% to DIY retail customers.

**B.     AAP Experiences Rapid Growth, Culminating in GPI Acquisition**

64.     Since the late 1990s, Advance Auto has grown substantially, driven in large part by significant acquisitions, including its 1998 purchase of Western Auto Supply Company, 2001 purchase of Discount Auto Parts, Inc., and 2012 purchase of B.W.P. Distributors, Inc.

65.     On October 16, 2013, in its most recent and largest acquisition, Advance Auto announced that it was acquiring GPI, a privately held company, for a purchase price of $2.04 billion.  The acquisition closed on January 2, 2014.

66.     Prior to the acquisition, GPI was a distributor and supplier of original equipment and aftermarket automotive replacement products for Professional customers, and operated under the Carquest and Worldpac banners. At the time of the acquisition, GPI operated 1,233 flagship Carquest stores and 103 Worldpac branches located in 45 states and Canada. GPI also serviced approximately 1,400 independently-owned Carquest stores.

67.     By integrating Carquest's Professional-heavy sales into existing Advance Auto stores, the Company hoped to transform itself from a DIY-focused store into a dual-focused store (i.e., DIY and Professional).  Notably, this was a strategy that had been successfully employed by Advance Auto's chief competitor, O'Reilly Automotive, eight years earlier in 2008 with its purchase of CSK Auto Inc. ("CSK").

68.     In a press release issued on October 16, 2013, the Company said its acquisition of GPI "creates the largest automotive aftermarket parts provider in North America, with annual sales

of over $9.2 billion and more than 70,000 Team Members." The Company further heralded the acquisition of GPI for its ability to "Deliver[] Scale," i.e., provide "complete coast-to-coast coverage across North America, creating a company with scale, reach and expanded growth opportunities benefiting shareholders, customers and team members."

69.     The Company was also quick to point out the synergies and cost savings it hoped to realize from the acquisition. In a press release, the Company stated: "Advance anticipates that the transaction will result in approximately **$160 million** of annual run-rate synergies to be fully realized within three years after closing"—i.e., by January 2017. Then-CEO Darren R. Jackson ("Jackson") was similarly quoted: "the combination of the two companies is a great fit and the synergy of GPI's assets with our capabilities will allow us to capitalize on market opportunities that will create value for our shareholders and provide even better service to our customers."

70.     The Company further announced that the critically important Carquest integration would be led by its President, George Sherman ("Sherman"). At the time, Sherman was quoted as saying, "[w]e see commercial as an important part of our growth strategy."

71.     The deal was immediately heralded as a game changer—not just for AAP, but for the industry as well. For example, Deutsche Bank AG ("Deutsche Bank") wrote, "[w]e view this as a *game changing acquisition* which, by combining the #3 and #4 player in the industry by sales, *immediately creates the market leader*." In a report issued on October 16, 2013, Barclays called the deal "*highly transformative*." Credit Suisse Group AG ("Credit Suisse") echoed the sentiment: "[w]e view AAP's decision as a smart strategic acquisition that vaults the company into a *much stronger position in the faster growing and more attractive [do-it-for-me] segment* and gives them a crown jewel in Worldpac."

72.     Following the October 16, 2013 announcement, Advance Auto's shares rose as much as 20%, reaching a then all-time high.

**C.      As AAP Stagnates, Starboard Takes Notice and Publicly Touts an Ambitious Plan to Accelerate the GPI Integration, Improve Margins by Up to 750 Basis Points, and Boost AAP's Stock Price**

73.     For a time, it appeared as if the Company was on track to deliver on its promise to realize $160 million in synergies by January 2017. The Company marched through 2014 and 2015 repeating and reaffirming its goal to achieve the long promised synergies from the GPI acquisition.

74.     Still, despite the initial enthusiasm for the GPI acquisition, the synergies AAP hoped to realize did not immediately materialize. During 2015, comp store sales and operating margins stagnated and even declined.  Investors were growing impatient with AAP's progress.



75.     Still, management assured investors that all was "on track." During a conference call to discuss the Company's 2Q15 earnings on August 13, 2015, Sherman stated: "our core commercial business continues to face a larger proportion of integration related change, namely in

people and products, ***but showed steady improvement***." With respect to the all-important integration of AAP's and GPI's IT systems, Sherman further stated:

> Our fifth key priority focuses on our systems and supply chain integration efforts. As mentioned previously we are focused on migrating to a common catalog, and we are on pace with our development efforts. ***We should be in pilot in Q1 of 2016 with a rollout to follow as we indicated last quarter***. This is also an enabler to aligning our supply chain systems, and ***we remain on track to begin the integration of the Carquest and Advance DC networks by the middle of next year***.

76.     Just a month and a half later, on September 29, 2015, with the Company all but treading water, the *Wall Street Journal* reported that activist investor Starboard had acquired a 3.7% stake in Advance Auto.  At the time, AAP's stock was trading at roughly $170 per share. The investment, worth more than $460 million, made Starboard one of the 10 largest Advance Auto shareholders.

77.     As is typical of Starboard's strategy when attempting to execute a corporate takeover, Starboard immediately convened a press conference, announcing its stake and laying out its business case for how it, through intervention in the Company, would improve AAP.   At an investor conference in Toronto on September 30, 2015, Starboard laid out its case for how to accelerate the GPI acquisition and deliver significant value to shareholders.

78.     The presentation noted initially that AAP, while seemingly well positioned, had "***substantially underperformed peers on almost any measure***, including operating margins, revenue growth, and total shareholder return." What's more, it pointed the finger directly at AAP's current management, with a stinging slide showing the Company's margins had actually ***decreased*** following the GPI acquisition:



79.     Given AAP's "substantial[] underperformance," Starboard proposed a plan to turn

the Company around. Its "Investment Thesis" was based on several "core pillars," including:

- Improve margins by **600 to 750 basis points**.
- Return significant capital to shareholders "through a **substantial dividend and/or buyback program**."
- "Pursu[e] **further industry consolidation**," particularly in the Professional segment, where "economies of scale and density of routes is critical, making further consolidation **highly strategic**."

80.     All told, Starboard estimated that its plan could be worth **in excess of $360 per**

**share**, more than double AAP's then-current market price of $171.40 per share. If AAP was able

to reach O'Reilly's level of profitability, the Company's implied stock price would be in excess

of **$420 per share**:



81.     The market was impressed by Starboard's pitch. Shares of AAP soared nearly $20, or 11%, following the Toronto presentation, from $170.53 on September 29, 2015 to $192.04 on October 1, 2015.

82.     Analysts took notice as well, pointing both to Starboard's track record of turning distressed companies around and the speed with which it had done so. In a September 30, 2015 report, UBS Group AG ("UBS") wrote:

> For the longest time, the pitch on AAP was it could close the margin gap with its peers, creating significant value. ***Now, we think this investment case has much more credibility***. Starboard is a respected firm in the circles of investing in retail/consumer companies. ***It has a record of creating real change***. In our view, its preceding activist situations that closely parallel AAP lead us to believe ***there will be a greater level of accountability placed on AAP***.

83.     Similarly, in a September 29, 2015 report, J.P. Morgan Chase & Co. ("JPMorgan") wrote: "what we believe Starboard is focused on is the quality of execution and ***speed at which the targets are achieved*** and ***thus their goal is to act as a credible threat to stir management***

*change if these fall short*, in our view."

### D. Starboard Installs New Board Members, Ousts the Company's CEO, and Appoints Its Hand-Picked Management Team

84. The market also understood that Starboard's investment signaled the beginning of the end for AAP's previous management regime. Indeed, Starboard wasted no time securing an agreement to install its handpicked team to lead AAP's purported turnaround.

85. On November 12, 2015, barely a month after Starboard had disclosed its position in the Company, AAP announced an "agreement" with Starboard to implement a host of changes to meet the activist investor's demands ("Starboard Agreement"):

- <u>First</u>, Smith, Starboard's CEO and Chief Investment Officer, was appointed to the Company's Board of Directors. Smith would serve as chair of the Nominating and Corporate Governance Committee (which was comprised of Smith and just one additional Board member) and as a member of the Compensation and Finance Committees. To accommodate Smith, the Company would expand the size of its Board from 12 to 13 members.

- <u>Second</u>, Starboard would designate two directors to be added to AAP's Board at the Company's annual meeting in May 2016.

- <u>Third</u>, AAP itself agreed to replace two additional directors designated by Starboard at the annual meeting.

- <u>Fourth</u>, then-current CEO, Darren Jackson, agreed to step down, effective January 2, 2016.

- <u>Fifth</u>, the two-person Nominating and Corporate Governance Committee (chaired by Smith), together with Executive Chairman of the Board, Jack Brouillard, would hire an executive search firm and initiate a process for selecting a new CEO for the Company.

- <u>Finally</u>, President George Sherman would serve as interim CEO, as part of a "leadership transition," while the Company searched for a permanent replacement as CEO.

86. In a press release at the time, AAP's then Executive Chairman of the Board, Jack Brouillard, praised the move, and indicated the Board's willingness to work closely with Smith going forward: "Jeff is a respected leader, investor, and valued board member. *We welcome his*

24

*insights*, and ***the Board and I look forward to working closely*** together as we successfully execute on our strategic objectives."

87.     While the announcement of the Starboard Agreement came on the heels of another disappointing quarter for AAP, investors seized on the management shift as a welcome development. For instance, in a November 12, 2015 report, BB&T Corporation ("BBT") wrote: "[d]espite all the favorable underlying trends in the automotive aftermarket, Advance Auto posted a very poor Q3 EPS of $1.93. Missing consensus by $0.13 and our estimate by $0.18 was apparently all the board could take, ***and it has now partnered with Starboard Value in an effort to turn things around***."

88.     Gordon Haskett Research Advisors ("Gordon Haskett"), in a report issued November 12, 2015, mused over Starboard's potential exit strategy:

> OK, so there is a new CEO coming and there is a pretty bad miss on the tape. That leads into the third piece of news which is the board is being overhauled. Coming in as one director will be Starboard's Jeffrey Smith and he will be bringing two designees with him. Beyond that, it looks like AAP will be naming two new directors ahead of the 2016 AGM. As you might have guessed, the "net net" in all this is a lower stock price. We'll see where it settles out but it looks like most of the Starboard pop will be coming out of the stock this morning. Looking forward, the big things to watch for are who will be named to run the company and whether AAP can meet and beat its margin goals. Also, ***with so many new directors coming aboard, no CEO in place and knowing Starboard's affinity for putting hardline companies together, we certainly wouldn't rule out an attempt to merge the company***. Mind you, AAP couldn't find a PE buyer in 2012 and there very well could be some anti- trust problems with a AAP-ORLY deal, but given today's news and ORLY's experience pulling value out of an acquisition (CSK), we're keeping this idea on the menu.

89.     For its part, in the face of management upheaval and poor results, the Company continued to reaffirm its goal to achieve $160 million in synergies by January 2017, first articulated at the time of the GPI acquisition. UBS called the development "encouraging[]," but nonetheless

cautioned that investors were growing wary of the Company's long term prospects: "[s]hould AAP miss this target, there is a risk for another round of downward revisions."

90.     Within days of the Starboard Agreement, Advance Auto issued a press release announcing that Eugene Lee, Jr. ("Lee"), the President and CEO of Darden Restaurants, Inc. ("Darden") had been appointed to the Company's Board by Smith and Starboard. Lee had previously been installed as head of Darden during a proxy contest initiated (and won) by Smith and Starboard in 2014.

91.     Then, on March 7, 2016, Advance Auto announced that Brad W. Buss ("Buss") and another Starboard nominee, Reuben Slone ("Slone"), had been appointed to the Board.  Like Lee, Buss was well-known to Starboard; less than three weeks later, he would be nominated by Smith and Starboard to the Board of Yahoo! Inc. ("Yahoo!") in connection with Starboard's efforts to replace Yahoo!'s entire Board.

92.     Less than a month later, on April 4, 2016, the Company announced it had hired Greco as its new CEO. Prior to joining AAP, Greco had worked for 30 years as CEO of Frito-Lay's North America division.

93.     It was widely understood that Greco had been hand-selected by Smith and Starboard. And while the move was largely applauded, many market watchers were quick to point out Greco's inexperience in the automotive industry. Morgan Stanley, for example, wrote: "[w]e view AAP's appointment of Tom Greco as CEO a positive step in the company's turnaround," but the "market was hoping that AAP's next CEO would have auto parts experience," as the "industry is competitive, SKU/knowledge intense and run by management teams with significant tenure in the segment." Jefferies Group LLC ("Jefferies") similarly remarked, "we view Mr. Greco's limited

turnaround experience and AAP's numerous 'moving parts' as his greatest challenge in the new role."

94.    Notably, despite Greco's lack of experience in the automotive industry, analysts were reassured by the fact that interim CEO George Sherman—the architect of the Carquest integration—would stay on with the Company as President. JPMorgan, for example, wrote: "[w]e are also pleased to see the President George Sherman is staying on board given his hands-on knowledge of the turnaround and CARQUEST integration. Continuity, we think, is critical given the intense level of change occurring at AAP." Deutsche Bank similarly wrote, "Sherman staying gives us a bit more confidence that things are progressing in the right direction."

95.    Roughly one month later, on May 18, 2016, the Company announced that Smith had been appointed Chairman of AAP's Board of Directors. In a news release, Smith touted the steps Starboard had taken since disclosing its investment the previous November: "[s]ince joining the Board in November, Advance has taken important steps to generate shareholder value, including implementing a more field-centric organization and appointing a new Chief Executive Officer."

96.    At the same time, AAP disclosed that its then-CFO, Mike Norona, would leave the Company after a successor was named.

97.    Any lingering doubts about who would be calling the shots at AAP going forward had been erased.  As the *Triangle Business Journal* explained, "[t]he board of directors at Advance Auto Parts is now **firmly in the grips of activist hedge fund manager Jeffrey C. Smith**, CEO and managing member of Starboard Value."

98.    In the midst of its management overhaul, Starboard continued to increase its investment in the Company. During the week of May 30, 2016, while the Company was trading

around $152, Starboard purchased an additional 400,000 AAP shares, worth roughly $62 million. In a report issued on June 9, 2016, Wyatt Investment Research openly took aim at Starboard's purported turnaround, and questioned its subsequent investment:

> [T]he turnaround plan has not worked as anticipated. In the first quarter, it was more of the same: Advance Auto Parts' comparable store sales declined 1.9% year over year, and it reduced its store count by another 1.5%.
>
> With the company continuing to struggle, it is confusing to see Starboard double down on its investment in Advance Auto Parts shares.

99.     Starboard continued forward, undeterred. On July 29, 2016, in its most surprising move yet, the Company announced that Sherman would be stepping down, effective August 13, 2016. Following the move, analysts, such as BTIG LLC ("BTIG"), expressed skepticism at the rate with which Starboard had turned management over: "[i]n our opinion, the significant number of senior management changes at Advance Auto during a period of intensifying competition and during a critical juncture in the assimilation of ~2,500 Carquest stores (both company-owned and franchise) is **not ideal**." In rationalizing the move, *Motley Fool* noted, "activist investor Starboard Value has agitated for the company to find ways to improve profitability."

100.    Then, on October 5, 2016, the Company named Okray as CFO, completing AAP's near-total makeover. In a press release, the Company said Okray is "very familiar with a supply chain that must respond rapidly to online demand," which would be "increasingly critical to accelerating our growth at Advance going forward." Echoing Starboard's Toronto presentation, Okray was likewise quoted as saying: "Advance is a well-positioned industry leader with an extraordinary opportunity to deliver improved performance." At the same time, the Company announced their Chief Accounting Officer, Jill Livesay, would resign.  Starboard's transformation of Advance Auto was complete.

E.      **Following Starboard's Effective Takeover, AAP Claims "Positive" Growth
        and Announces a Bold Five Year Plan to Maximize Margins and Grow Sales**

101.    With new management in place, the Individual Defendants and Smith sought to
reset investor expectations about AAP's growth and margin prospects.  On the first day of the
Class Period, November 14, 2016, AAP released its third quarter 2016 results.  They continued to
be dismal, with comp store sales of negative 1% and operating income of just $217.6 million.

102.    Yet, Okray and Greco—deflecting from the lack of improvement that was delivered
since Starboard had taken over, and facing the prospect of Starboard's massive investment losing
much more value so close to year end—spun another story.  They announced an ambitious five-
year plan, which they intimated was already well under way.

103.    Okray told analysts on the November 14, 2016 Earnings Call ("3Q16 Conference
Call"), in no uncertain terms: "*[f]or 2017, we will deliver positive sales comp growth and a modest
increase on operating margin.*" Greco later explained, "*we're excited about our comp prospects
for the next year, very excited about it.*" Defendants further promised 500 basis points of margin
expansion—or $500 million in gross productivity—by 2021.

104.    Also on November 14, 2016, Greco and Okray gave a presentation to investors in
which they reaffirmed their commitment to "positive" comp store sales growth, this time providing
additional detail and indicating that the Company expected "*[m]id-single digit comparable sales
growth.*" The presentation further repeated Defendants' guidance of "[a]t least 500 basis points of
operating margin improvement."



105. The presentation also touted the purported progress AAP had made in integrating

AAP's and Carquest's respective IT systems:

### Test and Learn Initiatives Delivering Positive Results

| Increase In "In Market" Parts Availability | Decrease In Order To Delivery Time | Overall Reduction In Inventory and Days On Hand |
|---|---|---|

*"We can **close big jobs faster and easier** now."*

*"Now I can get all the **hard-to-get parts**."*

*"… I'm confident I'll **get the parts the same day**."*

*"Whatever you guys are doing, **it's working for me**. I get parts quicker, cars spend less time on the lifts, so I get more jobs done."*

16    Advance Auto Parts

106.    On the earnings call, Greco touted these slides and concluded, "[t]he bottom line here is that our changes are leading to increased sales, lower costs, lower inventory levels, and higher customer satisfaction."

107.    The market reacted very favorably to these statements. Notwithstanding another quarter of lackluster performance AAP's stock shot up nearly 15% overnight.

108.    Analysts latched on to Greco's promise of positive comps, improved margins, and 500 basis points of margin expansion. For example, in a report issued November 15, 2016, Credit Suisse, wrote:

> AAPs Q3 and strategic update was **one of the better scenarios** for this stock with better than expected comps, positive commentary on Q4, a roughly in line 2017 outlook, **and a new sense of direction on how this new management team will narrow the margin gap with peers** . . . .timed with Q3/4's improvement, this **should help instill some early confidence in this team**."

109.    RBC Capital Markets ("RBC") similarly noted: "[t]hese results reflect a **meaningful acceleration** on both a two-year (to -0.5% from -3.2%) and three-year basis (to +1.0% from -0.6%) and **should be viewed encouragingly** given Advance's recent slew of top-line disappointments driven by company-specific issues."

110.    Any reasonable investor listening or seeing this guidance would believe that Greco's and Okray's projections were based on hard facts that they had accumulated since Starboard had taken control.  But as set forth below, these projections were wholly fabricated targets generated with little to no input from AAP's sales force and regional managers, and had no basis in the actual performance being modeled by AAP's experienced Finance Team.

111.    As the year closed, AAP's stock price was buoyed by the optimistic, headline-grabbing promises of Greco and Okray, and neared close to the $170 price at which Starboard had acquired AAP's shares.

112.     Unsurprisingly, given the unequivocal promise of increased comp store sales and operating margins from Greco and Okray, market commentators were beguiled.  On January 12, 2017, CNBC's Jim Cramer extolled that given how AAP's turnaround had "worked so well all sort of acquirers could be salivating over this company at these levels."

113.     On February 21, 2017, Advance Auto published its 4Q16 results.  The Company's comp store sales were seemingly positive (3.1%), but AAP posted subpar results in operating income ($106 million) and EPS ($0.84). In a report issued the next day, February 22, 2017, Barclays noted that "[m]argin and EPS was *disappointing*," and Guggenheim Partners ("Guggenheim") said "we remain on the *sideline*."

114.     In an effort to once again distract from the evidence that Starboard was continually failing to show any appreciable margin improvements or sales growth, Defendants Greco and Okray once again offered a tantalizing, but untrue, projection for 2017 performance.  Along with the fourth quarter results, Defendants offered further detail on its FY17 Guidance to investors, which included comp store sales growth of *0% to 2%*, and *15 to 35 basis points* in margin improvement.

115.     Once again, the market interpreted this guidance as proof that Starboard's strategic plan was working and viewed the FY17 Guidance as confirming Defendants' November promise of "positive" comp store sales and 500 basis points in margin expansion. For instance, on February 22, 2017, Guggenheim wrote that the FY17 Guidance's comp store sale growth and EBIT margin expansion "aren't meaningfully different than management's [November 14, 2016] initial" guidance. Jefferies similarly noted the FY17 Guidance was "consistent with AAP's previously stated strategic plan to regain share and drive sales growth as *management reiterated their target of 500 bps* of operating margin expansion over the next five years."

116.    However, as set forth below, there was no factual basis behind these projections, which were directly contradicted by internal company data. As would later be confirmed, sales and margins had been declining steadily in late 2016, and the Company's own internal forecasts were showing gross sales growth of negative 2%-4% for 2017.

**F.      Behind the Scenes, the Company Struggles to Integrate Carquest and Forecasts Negative Sales Growth for 2017**

**i.      The Company Fails to Integrate AAP's and Carquest's Legacy IT Systems**

117.    At the time Starboard purchased its $460 million stake in AAP, the Company was still in the process of integrating GPI and, in particular, its flagship Carquest stores.  Despite the Company's outward projections of confidence, the integration had been marred by delays and setbacks, which had resulted in lost customers, supply chain disruptions, IT integration issues, and inventory build-ups.

118.    Most significantly, during the Class Period, Advance Auto and Carquest stores and DCs operated on two distinct legacy IT systems, dubbed internally as "Red" (Advance Auto) and "Blue" (Carquest). Notably, however, the respective IT systems were not compatible with one another. According to FE 13, a Field Process Manager, the Red and Blue systems were like "oil and water."  This lack of compatibility led to a host of problems which prevented AAP from realizing any real synergies from the GPI acquisition during the Class Period.

119.    First, according to FE 10, an RVP, the Company lost sales it should have won because AAP stores were not able to access parts that were located in Carquest's inventory, and vice versa. This problem was particularly acute in the context of the highly lucrative Professional market—which AAP hoped to capture with the Carquest acquisition—whose main feature of differentiation was time to delivery. Unable to get parts to customers in time, the Company lost significant business.

120.    For example, FE 14, a Supply Inventory Planner, recalled investigating an incident where an AAP store in Bangor, Maine could not pull products from a Carquest DC 1.2 miles away, but instead had to pull from an AAP DC 416 miles away. By the time the product arrived, the customer had already left.

121.    Such issues were, moreover, communicated directly to Defendants. In December 2016, for example, FE 10, an RVP in the North Region, attended a conference call with Greco, EVP Charles Tyson, SVP Bill Carter, North President Durkin, RVP Morgan Schaefer, RVP Frank Miller, RVP Jason Hand and others to discuss why sales goals had not been met for November 2016. Each RVP told Greco the problem was supply: store managers could not get their parts to customers in time, which in turn caused them to miss out on sales. During the call, Greco specifically referenced a report that showed FE 10's DC had only a *70% probability* of getting parts to the stores on time—well short of the Company's goal of 98%, as told by FE 10.

122.    Second, and relatedly, the Company struggled to maintain appropriate levels of inventory because it lacked an effective means to track its sales across AAP and Carquest stores. As FEs 3 and 10 explained, with inadequate inventory, customers were frequently told the Company did not have the products they needed.

123.    The Company's inventory woes also led it to lose significant amounts of product from shrinkage. FE 15, an Asset Protection Manager, attended a meeting in March or April 2017 in Charlotte, North Carolina, with all of the Company's other Asset Protection Managers and Mike Cox, SVP of Asset Protection. Cox said: "[w]e have $19 million in shrink and did not report it. Don't ever repeat this. It is our job to find it." FE 15 further recalled an Asset Protection Manager, Gloria, who had shrink issues in the Western territory she oversaw of $7 to $8 million.

124.    Such issues were also communicated directly to Defendants. For instance, FE 3, an RVP, attended quarterly operational meetings in Roanoke and Raleigh during the Class Period, which were attended by all executives at the RVP level and above, including Greco and Okray. FE 3 said inventory issues were repeatedly raised at these meetings as an impediment to sales, yet Greco would deflect to unrelated topics, refusing to address the inventory concerns. According to FE 3, Greco's priorities "were not related to selling parts." FE 3 realized the employees' complaint were futile. Eventually they stopped.

125.    FE 5, a Commercial Sales Manager, similarly recalled attending a meeting at the corporate headquarters in Raleigh in or around February or April 2017, where FE 5 raised the IT integration and sales challenges facing the Company at that time with Greco and Smith directly. According to FE 5, there was "no clear message" regarding FE 5's concerns. Instead, the response was: "we need to cut costs, so let's cut employees."

126.    Other high-level executives closely tracked the progress of the integration and reported back to Defendants, as described by FEs 4 and 6. In particular, according to FE 6—a Program Manager who supported the Director of Integration & Strategy—SVPs, including SVP of Supply Chain, Todd Greener,  attended monthly Integration Meetings to discuss its progress. The Integration Meetings were also attended, at times, by EVP Charles Tyson and the CEO. According to FE 6, during the Class Period, the SVPs reported back to Greco and Okray following the Integration Meetings.

127.    FE 4, a Program Manager, stated that all of the executives and SVPs who attended the Integration Meetings were well aware of how poorly the integration was going during the Class Period. FE 4 recalled that the issue of inventory and supply chain was consistently discussed at the Integration Meetings, and senior executives knew of it during the Class Period. FE 7, a Senior

Business Analyst, agreed that the integration issues were "all day, every day." And FE 6 added the progress of the integration was "never fast enough."

128.     In short, as FE 16, a Regional Pricing Analyst, explained, the "polar opposite" IT systems created an infuriating and duplicative process for ordering customer parts and tracking inventory. As FE 8, a Senior Executive with forecasting responsibility, explained, the declining comp store sales growth was due to "traffic and transactions." That is, unable to ensure they had the parts that were needed, customers stopped shopping at AAP. In fact, according to FE 8, the number of sales (i.e., "transactions") AAP had been generating was declining by 5% YOY from mid-2015 through June 2017, when FE 8 left.

129.     What's more, by all accounts, the IT problems persisted throughout the Class Period, continuing to press down on AAP's sales. To be sure, these wounds were largely self-inflicted. As the Director of Supply Chain Integration, FE 6, explained, the Company had decided by no later than Fall 2016 that the Red and Blue systems needed to be converted to a new, proprietary system. But rather than address the issue, Greco punted. According to FE 3, a former Vice President of Sales and Operations, under the direction of Jackson and Sherman, "the number one concern was the integration of Carquest." But after Greco took the helm, the Carquest issues were "not a priority," and "were not even in the top 5" issues Greco wanted to focus on.

130.     Tellingly, as FE 6 explained, as of June 2017, the Company was "***still formulating plans***" for how to convert the systems. Remarkably, despite the known issues with the incompatible Red and Blue Systems, according to FE 6, the first conversions were not scheduled to begin until ***January 2018***. Multiple additional FEs confirmed the Red and Blue IT systems had not been merged by the time of their departure:

- FE 9 stated the IT issues had not been fixed by July 2017.

- FE 14, a Supply Inventory Planner who worked extensively on the Company's supply chain, stated the IT issues had not been fixed by September 2018.

- FE 3 stated the IT issues had not been fixed by January 2018.

### ii.     As IT Issues Mount, Defendants Exacerbate AAP's Problems by Making Drastic Cuts

131.    AAP's Class Period problems were not limited to IT. Indeed, as FE 9, an RVP, explained, "integration of IT inventory was bad, **but the loss of people was worse**."

132.    FE 18 said AAP people and Carquest people could not agree on anything. Faced with sagging sales due to unaddressed integration problems, Defendants resorted to drastic labor cuts in an effort to deliver the margins they were promising investors. FE 2, a Financial Analyst said, point blank, that bad conditions at AAP led to layoffs. As told by FE 13, AAP tried to become more "lean" by cutting the jobs of good, well-performing individuals.

133.    More specifically, beginning in January and February 2017, FE 17, a DM, recalled discussions of cost cutting measures such as personnel cuts, and cuts to Company phones and cars. FE 5, similarly recalled the Company cut roughly half of its Commercial Sales Managers in February or April 2017. Numerous former RVPs, including FEs 9 and 12, explained how the Company laid off 22 of 34 RVPs and hundreds of DMs in or around June 2017—over a conference call. In fact, the Company's own annual disclosures—which show a decrease of **3,000 employees**, or more than 4% of its labor force, between February 23, 2017 and December 30, 2017—largely corroborate this information.

134.    The massive layoffs led to other less obvious—but equally detrimental— consequences. Most notably, a large-scale customer service crisis arose from the intermingling of AAP and Carquest employees, who were most used to dealing with DIY/retail and Professional customers, respectively. That is, as AAP consolidated Advance Auto and Carquest stores, bringing former Carquest employees to work at nearby Advance Auto stores, those employees lacked the

customer service skills and experience to secure sales with DIY/retail customers. In that regard, Defendants ignored the differences in the DIY/retail and Professional industries, which, as described by FE 11—who was responsible for the commercial business integration and the integration of all 1,200 Carquest stores—require two completely separate strategies.

135.    FE 11 further stated Carquest commercial customers were not moving over to AAP at the expected rates because AAP was perceived as a retailer with poor commercial parts. Furthermore, FE 11 added, when AAP tried to impose its business will on the Carquest employees, many were put off and resigned, taking with them Carquest customers. FE 11 stated the poor rate of conversion became evident shortly after acquisition and never trended up. FE 11 added, "[t]hey purchased Carquest.  There was a growth expectation, but not a lot of thought was put into the disruption that the acquisition would cause." Customers would only come to AAP so long as they had confidence in the Company's employees, mentioned FE 18, and the decline in employee quality had eroded customer confidence.

136.    Further detracting from employees' performance, the integration problems created what FE 16 described as an environment where morale was "not great" the entire time FE 16 worked there. FE 20, a Pricing Manager who had come over from Carquest, said AAP saw great turnover in upper sales leadership during the Class Period. FE 9, an RVP who had an extended period of service with the Company, resigned over frustration with AAP's treatment and implementation of its layoff strategy. Management became increasingly toxic, according to FE 19, a Product Data Specialist, as executive management became estranged from the employees that remained.

137.    More fundamentally, departures and layoffs led to a strain on resources during the Class Period. FE 8 said the supply chain became undermanned, further exacerbating an already

dire situation with the failing IT integration of the inventory management systems. FE 5 similarly explained that fewer employees left the Company without staff to make deliveries, and the labor shortages were so bad at times that store managers were forced to make deliveries themselves. FE 5 "definitely lost customers" because of the labor shortages.

138.    According to FE 21, a Sales Manager, DMs monitored AAP stores so closely that, if a store was behind its target "daily sales numbers," the DM would call and tell the employees to "clock out and go home for the day" without pay. DMs would also look at weekly store performance figures. If a store was falling short of its weekly figures, the DM would cut the hours of employees at the store for the upcoming week. FE 21 said payroll was the "biggest issue." "Everything was about payroll." The Company made cuts to payroll to try to cut store expenses.

### iii.    In the Face of Persistent IT Issues and a Depleted Labor Force, Defendants Are Consistently Told of Poor Sales, Reduced Margins, and Negative Forecasts

139.    The internal chaos and unaddressed integration issues made it impossible for the Company to meet, let alone exceed, the sales and margin targets set by management.  Indeed, internally, it was widely acknowledged that sales teams were unable to meet their targets, quarter after quarter.

140.    For example, during weekly RVP Sales Meetings throughout 2016 and 2017— telephonic meetings which occurred at 10:00 am with SVP McCartney and all South Division RVPs—FE 9 was consistently told by McCartney that sales were missing targets.[2] At these meetings, McCartney presented sales data using a so-called Claw Back Spreadsheet, personally created by Greco.  The Claw Back Spreadsheet: (i) calculated the sales needed to get back to the

---

[2] Greco would later confirm the existence of such meetings during a post-Class Period conference call on November 14, 2017: "[w]e have a call every week with the RVPs where we get feedback. We have ways of hearing from our districts and reporting back up."

Company's AOP (i.e., target or budget) for each RVP; (ii) ranked each RVP's monthly, weekly and annual sales growth; and (iii) showed the Company's total sales needed to get back to AOP. During the Class Period in 2016 and 2017, all RVPs were in "***Negative Comp***" Status.  In other words, it was obvious to Greco that the Company could not meet the targets he and Okray had set.

141.    Similarly, FE 12, at the time an RVP, said from mid-2016 through June 2017, the majority of AAP's stores nationwide were ***trending down*** in terms of sales. In fact, only two of the 15 RVPs in FE 12's Division were meeting their sales targets during this time. FE 12 based this information on FE 12's review of daily sales reporting which, like Greco's Claw Back Spreadsheet, tracked total sales on a daily basis and ranked each RVP's comp store sales.

142.    Many additional FEs have corroborated FE 9's and FE 12's account that the Company was performing poorly and missing its targets leading up to and throughout the Class Period. For example:

- FE 7—a Senior Business Analyst in charge of forecasting sales for car brakes (AAP's largest revenue producer)—observed that sales during 2016 were on a ***downward trend*** and there were ***declines across the board***.

- FE 2, a Financial Analyst with AAP, said the Company missed its operating margin AOP targets for 4Q16 by a ***greater amount than any previous quarter in the year***, and missed its targets in 1Q17 and 2Q17 by ***double digit basis points***.

- FE 3 said at the end of 2016, and in early 2017, "***nobody was 'winning'***" (i.e., hitting their sales targets).

- FE 5 never hit FE 5's sales targets during 2017, and sales misses were "***rampant***" among FE 5's Commercial Sales Manager counterparts during the same time period.

- FE 17's District and Region were operating at approximately ***negative*** 8% or 9% year-to-date comp store sales growth when FE 17 left in June 2017.

143.    Numerous FEs confirmed that Defendants were aware of and directly informed about the trajectory of sales within each of the sales regions.  For example, according to FE 17, Greco sent out quarterly e-mails to demand the sales personnel raise their numbers. Greco

continued this practice during 4Q16 and 1Q17. FE 17 added that, not only did Greco have access to programs that tracked the Company's sales numbers—daily and, sometimes, even hourly—like Ignite, but Greco was, in fact, tracking and scrutinizing those sales numbers.

144.    Likewise, during 4Q16, FE 8 personally participated in weekly Results Meetings with Greco and Okray where attendees discussed sales performance and trends, and the reasons for the negative results. Results Meetings were held weekly at 4:00 pm in the Company's Raleigh, North Carolina office, to discuss results against AOP and forecasts. The meetings were led by FP&A Director Mike Keating, and attended by Greco and Okray, as well as the Executive Vice President of Pricing, Executive Vice President of Merchandise, Executive Vice President of Inventory, Vice President of Finance, Department Heads, and other executives.

145.    The "rampant" sales misses were also explained by the unattainable targets set by Greco and Okray which formed the basis for their guidance to investors.  In fact, to deliver on their promise of up to 2% comp store sales growth, Greco and Okray established an "across the board" directive to raise sales by 3%, which they knew to be unattainable.  More precisely, in addition to rapidly declining results, Greco and Okray were shown forecasts which showed ***negative*** trends for 2017 during Results Meetings. As a Senior Executive - Finance, with forecasting responsibility, FE 8 personally prepared these sales forecasts, which were generated through a "bottoms up," algorithm-based approach, where past sales trends and data would be used to predict future sales ("Finance Forecasts"). In August 2016, FE 8's Finance Forecasts showed gross sales growth of ***negative 3%*** for 2017.

146.    Refusing to accept the Finance Forecasts, late in 3Q16, Greco spearheaded a reorganization of the financial reporting within the Company. He created four "Divisional Presidents," each with their own financial analyst or "Operator" placed in the field.  Greco then

directed the Operators to generate a second, more aggressive set of forecasts ("Greco Forecasts"). According to FE 8, the Greco Forecasts were "***pie in the sky***." Notably, however, by Thanksgiving 2016, even the best Greco Forecasts for 2017 were just ***negative 1.5%*** gross sales growth.

147.    According to FE 8, after reviewing the "pie in the sky" Greco Forecasts in Fall 2016, Greco personally set an across the board gross sales target of ***positive 3%***. FE 8 added that this directive coincided with a Board meeting in late 2016, where it was decided that positive 3% gross sales growth was needed to report to the Street. In December 2016, Okray reaffirmed Greco's target, vowing to hold the field accountable to the 3% directive.

148.    FE 3 confirmed that Greco and Okray then "pushed down" on the RVPs, demanding 3% sales growth "***across the board in all stores***." FE 3 added that such a "top down" directive had never happened before, as it made little sense to expect all stores, regardless of location, to hit the same target.

149.    FE 10 said point blank sales targets for 2017 were not attainable: "***no, we knew they [targets] weren't***." FE 10 added that to post a 0-2% comp store sales growth, as Defendants would later tell investors, would have been "***monumental***." FE 5 agreed sales targets were set so poorly, there was no way they could be overcome. FE 21, a store manager, likewise said sales targets were "impossible to hit."

150.    With no viable plan to meet the 3% target through organic sales alone, Defendants proposed a host of desperate initiatives to boost profitability. They suggested marketing promotions, price cuts, store closings and consolidations, and staff reductions. But the initiatives failed to take hold. By late December 2016, FE 8's Finance Forecast for gross 2017 sales had dropped to ***negative 4% to 5%***.

151.    By early 2017, the situation had become dire. According to FE 8, in January 2017, Greco hired a team of approximately 30 consultants from McKinsey & Company in a last ditch effort to drum up sales.  Even McKinsey was of no help, however.

152.    No later than mid-March 2017, FE 8 said the "shit hit the fan." The financial situation coming out of 1Q17 was a "disaster," prompting a Board meeting.[3] At the time, according to FE 8, AAP had missed 1Q17's sales AOP by *$25-$30 million*, and was approximately *$20 million* behind plan for 2Q17. FE 5's territory alone—which included parts of Ohio, Pennsylvania and New York—was *$20 million below AOP* going into March 2017. During the Board meeting, according to FE 8, the Board specifically asked Greco and Okray if they wished to update the Company's forecast. *They declined*.

153.    Rather than come clean, Defendants continued to deflect. During the Company's 1Q17 results call on May 24, 2017, they blamed poor sales on the weather, promised sales in the second half of 2017 would accelerate and reaffirmed the guidance issued in February. Greco even went so far as to say the "soft patch" in 1Q17 was "*a blip, not a trend*."

154.    But numerous FEs have repudiated the Company's excuses as baseless. FE 3 stated that the Company "*was never on track*" to hit the target it provided to Wall Street, and FE 3 "would have been fired" if FE 3 had blamed poor sales on the weather. FE 16 had never heard that gas or weather was causing negative sales. FE 14 said gas and weather were no more of a factor for AAP than for any other retailer. In short, according to FE 9, "*[w]hatever they said to Wall Street was not real*."

---

[3] The timing of FE 8's allegation with respect to the Board meeting is corroborated by the Company's own 2018 Schedule 14A Proxy Disclosures, which state that the Board "met seven times" during 2017, during which they "reviewed and discussed the quarterly and annual reports prior to filing with the SEC," and "reviewed and discussed the quarterly earnings press releases."

155.    With none of the core problems impacting sales addressed, the Company's situation continued to deteriorate. Less than nine months after Greco's initial promise of "*positive*" comp store sales growth, and just six months after issuing his baseless guidance of up to *2%* comp store sales growth, Greco was forced to admit that his projections were false. On August 15, 2017, Greco slashed AAP's guidance.  He cut comp store sales growth projections from positive 2% to negative 1%-3%, which were the very numbers FE 8 had provided to Greco eight months earlier.  Similarly, Greco slashed his projections for 2017 operating margins by *200 to 300 basis points*, again consistent with the information he had been provided by FE 2's team prior to issuing his made-up projections in November 2016 and February 2017.

156.    During a conference call with investors the same day, Greco attempted to issue a mea culpa: "[w]e lacked the *coherent strategy*. Our frontline *turnover was unacceptable*. Our technology platforms were *segregated and difficult to navigate*. And our supply chain infrastructure was *duplicative and siloed*." Each of these concessions was of course true. But Greco and Okray did not simply make an innocent mistake in issuing the FY17 Guidance. Instead, they deliberately ignored hard data and issued guidance they knew to be unattainable, and thus false.

157.    Indeed, the market was quick to see through Greco's half-hearted apology. RBC said "management has disappointed investors and *hurt some of their initial credibility*," while Credit Suisse wrote "*it's difficult for investors to see that this is the bottom* . . . . [u]ntil AAP can show that earnings can grow, it's likely *stuck in the penalty box*."

158.    Following the announcement, the Company's stock price plummeted $22.24 per share, or over 20.3%, to close on August 15, 2017 at $87.08 per share.

## V.      MATERIALLY FALSE AND MISLEADING STATEMENTS

### A.      November 14, 2016

159.      On November 14, 2016, AAP filed a Form 8-K, signed by Okray, with the SEC.  In

the press release attached to the Form 8-K, the Company announced its results for the third quarter

of fiscal year 2016 (ended October 8, 2016) ("3Q16 Press Release"). In the 3Q16 Press Release,

Defendant Greco made the following statement touting the Company's quarterly results and its

outlook:

> *Our third quarter results reflect progress in driving our top line as the initiatives
> and investments we are making to stabilize and improve our sales performance
> began to take hold*. While we delivered sequential improvement, our results are not
> where we want them to be and we remain relentlessly focused on taking the actions
> necessary to improve our execution and generate positive comparable sales
> performance.

160.      Also on November 14, 2016, Defendants participated in the 3Q16 Conference Call

to discuss the Company's 3Q16 results and outlook. During the 3Q16 Conference Call, Defendant

Okray emphasized the Company's FY17 Guidance with analysts:

> The opportunities Tom [Greco] and Bob [Cushing] discussed to deliver improved
> results are familiar to me. I'm used to putting the customer first always. And I know
> we can drive accelerated sales growth and margin expansion included in our plan.
>
> Turning to the financial impact of our plan. *For 2017, we will deliver positive sales
> comp growth and a modest increase in operating margin*. By 2021 our plan
> delivers mid-single digit comp sales and at least 500 basis points of margin
> expansion. *As Tom previously discussed, we're building a platform to enable
> sustainable growth and operating leverage*. To achieve that goal, we've worked
> backwards from the customer and balanced our efforts to achieve growth, reduce
> costs and efficiencies throughout the organization.

161.      Greco also had an exchange with an analyst from BTIG about the Company's FY17

Guidance on positive sales comp growth and operating margins:

> **[ANALYST]:**  Okay. And just hypothetically, if, let's say there's an industry turn-
> down and sales don't meet your modest positive comps for next year. What point
> do you start to maybe take a more draconian view on perhaps closing a few

distribution centers and/or closing some stores?  Or is that not on the drawing board, even if you hypothetically don't meet your plan next year?

**[GRECO]:**  Well, first of all, *we're excited about our comp prospects for next year, very excited about it*.

162.    The statements contained in ¶¶ 159-161 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "the initiatives and investments we are making to stabilize and improve our sales performance began to take hold," (ii) "we're excited about our comp prospects for next year, very excited about it," and (iii) "[f]or 2017, we will deliver positive sales comp growth and a modest increase in operating margin," Defendants had actual knowledge of least the following:

    a) As of August 2016, gross sales for 2017 were forecasted to be negative 3% by the Finance Team. (¶ 145)

    b) As of Thanksgiving 2016, even the best Greco Forecasts were forecasting just negative 1.5% gross sales for 2017. (¶ 146)

    c) Greco's personally created Claw Back Spreadsheet showed that all RVPs were in "Negative Comp Status" during 2016 and 2017. (¶ 140)

    d) FE 3 said at the end of 2016, and in early 2017, "nobody was 'winning'" (i.e., hitting their sales targets). (¶ 142)

    e) According to FE 7, sales during 2016 were on a downward trend, and there were declines across the board. (¶ 142)

    f) Defendants' forecasts to the market were not based on any reliable methodology but rather a top-down directive issued to RVPs that they knew could not be attained because of their own internal forecasts, and because of the integration and inventory issues that were weakening sales and operating margins, and layoffs and cost-cutting that had demoralized their sales force. (¶¶117-138)

163.    Moreover, none of the statements alleged in ¶¶ 159-161 above were accompanied by any meaningful cautionary language identifying the known risks of not meeting the comp store sales and margin forecasts that Defendants had outlined, including the risks created by the integration and inventory issues, layoffs and cost-cutting.

### B.       February 21, 2017

164.    On February 21, 2017, AAP filed a Form 8-K, signed by Okray, with the SEC. In the press release attached to the Form 8-K, AAP reported its fourth quarter fiscal 2016 (ended December 31, 2016) financial and operational results ("4Q16 Press Release") and included AAP's "2017 Full Year Assumptions," a continuation of its FY17 Guidance.  This disclosure provided as follows:

| New Stores | 75 to 85 new stores including Worldpac branches |
|---|---|
| ***Comparable Store Sales*** | ***0% to 2%*** |
| ***Adjusted Operating Income Rate*** | ***15 to 35 basis points improvement*** |
| Income Tax Rate | 37.5% to 38.0% |
| Integration & Transformation Expenses | Approximately $30 million to $35 million |
| Capital Expenditures | Approximately $250 million |
| Free Cash Flow | Minimum $400 million |
| Diluted Share Count | Approximately 74 million shares |

165.    Also on February 21, 2017, Defendant participated in a conference call to discuss the Company's 4Q16 results and outlook ("4Q16 Conference Call").

166.    During the 4Q16 Conference Call, Greco made the following remarks:

So going forward, our overarching focus is clear: we're going to put the customer first, we're always going to do that, and our goals remain clear. ***And we plan to accelerate sales growth to above the industry average, and we're going to close the margin gap versus our competition***. So to achieve it, we're evolving the culture of the company to one that's excessively focused on the customer and one with an exceedingly high level of accountability, ownership, and drive for results.

***So we're really excited about 2017***. We'll be working with a high level of urgency to deliver on our objectives, and we look forward to updating you again on our progress next quarter.

167.    Additionally, during the 4Q16 Conference Call, Defendant Okray stated:

Now, turning our attention to the full year outlook for 2017. *We expect to deliver comparable store sales in the range of 0% to 2% and an adjusted operating margin increase between 15 basis points to 35 basis points for the year*. Notably, our full year adjusted operating margin expansion estimate also includes new inflationary pressures and expected cost increases in 2017 that either did not exist or were not material for us in 2016.

*     *     *

In summary, we are very pleased with our meaningful top-line progress in Q4 and remain confident in our strategy that we shared with you in November.

168.    During the 4Q16 Conference Call, Okray reaffirmed the Company's FY17 Guidance in the context of ongoing integration efforts and expenses in responding to a question from an analyst from Morgan Stanley:

> **[ANALYST]:** So my follow-up, I'll just make it two parts. So following up to that answer, does that mean, does this capitalization expense now roll off? Are we through it, and therefore, we should see that improve, meaning the gross margin rate improve from that, the lack of that headwind?  And then second part of the follow-up, if you take the 15 to 35 basis points of margin expansion in next year's guidance, is that purely a function of the leverage from the comp range 0% to 2%, or is there anything contemplated in the timing of as you get some of these SG&A savings, if that goes better, is that in that guidance range as well?

> **[OKRAY]:** Yes, Simeon, let me take that one. With respect to the capitalization supply chain cost, that's going to continue as we right size and optimize our inventory. Quite frankly, it's the right thing to do for the shareholders, it's the right thing to do for the Company, and we're going to make that decision every day of the week.  So it's going to be lumpy over time, but that's something that we need to do as we're building this transformation for the long haul. There's tremendous amount of cash flow opportunity by getting our AP ratio in line. Definitely underperforming our peers, not where we want to be. *With respect to the guidance, I think that it's going to be both of the things that you said. One is, it's going to be the top-line growth of the 0% to 2%, and as we build this productivity muscle that Tom described, we expect to also see benefits from not only SG&A, but also the gross profit line*.

169.    Further, in response to a question from a UBS analyst about Advance Auto's financial performance, Greco emphasized that Advance Auto was gaining momentum in improving its comp store sales performance, something that was of particular importance to

investors and analysts in reinforcing Advance Auto's FY17 Guidance on comp store sales and

operating margin:

> **[ANALYST]:**  What the market wants to see over the long run is that you can
> generate sales, gross margin expansion, SG&A leverage consistently on a quarter-
> to-quarter basis. Have you seen anything in the business that would prevent you
> from doing that over time, and how long do you think it's going to take for you to
> get to be able to sustainably producing that algorithm?

> **[GRECO]:**  *Well, thanks, Michael. First of all, we really are excited about the
> performance in the fourth quarter on the comp sales.* That was the most difficult
> piece that we had to tackle was to improve our comp sales performance and start to
> regain share momentum with our customers.

170.    Earlier in the call, Greco emphasized improving comp store sales as well, stating:

"*[w]e're very pleased with our improving comp sales performance.*"

171.    In the context of the ongoing difficulties being experienced with the AAP's

integration of Carquest, analysts at Jefferies took note of AAP's FY17 Guidance as part of "new"

management touting its ability to execute on the integration and deliver 500 bps in synergies as

part of its five-year strategic plan:

> We expect AAP's Q1 comp to slow sequentially to +0.7% from Q4's +3.1%,
> weighed by unfavorable weather and the calendar shift of a holiday into Q1'17.
> Management's FY'17 comp guide of 0-2% should be 2H weighted as customer
> service initiatives drive top line growth, while planned investments are expected to
> weigh on 1H margins with FY'17 EBIT expected to increase 15-35 bps. *This is
> consistent with AAP's previously stated strategic plan to regain share and drive
> sales growth as management reiterated their target of 500 bps of operating
> margin expansion over the next five years*.

172.    On February 22, 2017, Guggenheim agreed that the FY17 Guidance's comp store

sale growth and EBIT margin expansion "aren't meaningfully different than management's

[November 14, 2016] initial" guidance.

173.    The statements contained in ¶¶ 164-170 were materially false and misleading,

omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when

Defendants told the market, among other things: (i) for 2017, comp store sales growth will be "0%

to 2%" and adjusted operating income will "improve[]" by "15 to 35 basis points," (ii) "we plan to accelerate sales growth to above the industry average, and we're going to close the margin gap versus our competition," (iii) "we're really excited about 2017," (iv) "we really are excited about the performance in the fourth quarter on the comp sales," and (v) "we're very pleased with our improving comp sales performance," Defendants had actual knowledge of least the following:

    a) As of August 2016, gross sales for 2017 were forecasted to be negative 3% by the Finance Team. (¶ 145)

    b) As of Thanksgiving 2016, even the best Greco Forecasts were forecasting just negative 1.5% gross sales for 2017. (¶ 146)

    c) As of December 2016, gross sales for 2017 were forecasted to be negative 4%-5% by the Finance Team. (¶ 150)

    d) Greco's personally created Claw Back Spreadsheet showed that all RVPs were in "Negative Comp Status" during 2016 and 2017. (¶ 140)

    e) The Company missed its operating margin AOP targets for 4Q16 by a greater amount than any previous quarter in the year, and missed its targets in 1Q17 and 2Q17 by double digit basis points. (¶ 142)

    f) According to FE 3, at the end of 2016, and in early 2017, "nobody was 'winning'" (i.e., hitting their sales targets). (¶ 142)

    g) According to FE 7, sales during 2016 were on a downward trend, and there were declines across the board. (¶ 142)

    h) FE 3 stated that the Company "*was never on track*" to hit the target it provided to Wall Street. (¶ 154)

    i) According to FE 10, to post a 0-2% comp store sales growth would have been "*monumental*." (¶ 149)

    j) Defendants' forecasts to the market were not based on any reliable methodology but rather a top-down directive issued to RVPs that they knew could not be attained because of their own internal forecasts, and because of the integration and inventory issues that were weakening sales and operating margins, and layoffs and cost-cutting that had demoralized their sales force. (¶¶ 117-138)

174.    Moreover, none of the statements alleged in ¶¶ 164-170 above were accompanied by any meaningful cautionary language identifying the known risks of not meeting the comp store and margin forecasts that Defendants had outlined, including the risks created by the integration and inventory issues, layoffs and cost-cutting.

### C.      May 24, 2017

175.      On May 24, 2017, AAP filed a Form 8-K, signed by Okray, with the SEC. In the press release attached to the Form 8-K, AAP reported its first quarter fiscal year 2017 (ended April 22, 2017) financial and operational results, which missed consensus estimates ("1Q17 Press Release"). The 1Q17 Press Release contained the following statements from Defendant Greco:

> ***Our first quarter comparable store sales declined 2.7%. As expected, comparable store sales were unfavorably impacted by the shift in New Year's Day to the first quarter of 2017 as well as the significant shift of winter related demand into December. These factors pulled sales forward into the fourth quarter of 2016 and reduced comparable store sales in the first quarter***. Taking into account these shifts and normalizing for their impact across the 28 week period including the fourth quarter of 2016 and first quarter of 2017, ***we delivered positive sequential improvement in comparable store sales performance of approximately 70 basis points versus the third quarter of 2016***. This steady improvement demonstrates that we are making progress to improve our top line performance by taking decisive and consistent actions across the organization as we refocus the company on the customer.

176.      Also on May 24, 2017, Defendant participated in a conference call to discuss the Company's 1Q17 results and outlook ("1Q17 Conference Call"). During the 1Q17 Conference Call, Defendant Greco stated:

> ***In Q1, our comp store sales performance was down 2.7%. This result reflects the impact of a series of factors we anticipated in Q1, as well as short-term headwinds that were not planned***. These headwinds impacted the entire industry in Q1.
>
> *          *          *
>
> ***The sequential improvement we've delivered in recent quarters demonstrates we're making real progress***. At the same time, we were not immune to the macro headwinds within the industry, which resulted in unexpected substantially softer consumer demand in the middle of Q1, as reflected in the publicly available data. This timeframe was worse than expected and resulted in a slow start to the spring selling season.
>
> *          *          *
>
> [W]e delivered an adjusted operating margin rate of 7.1% and adjusted EPS of $1.60. ***Taking all this into account, we remain confident with the progress we're***

*making as we execute our plan and expect sales and customer momentum to continue with more operating leverage as we enter the back half of 2017.*

We're performing well relative to our primary input metrics as the beginning and end of the quarter was in line with expectations. *Unfortunately, the middle of the quarter was below plan, as was broadly experienced across the industry. We also believe the sales softness was short-term in nature given recent trends.*

\*       \*       \*

What we showed in November was our goal is to perform above the industry average in terms of sales growth and to expand margins significantly from where they are today. *That stands as we sit here today.*

177.    During the 1Q17 Conference Call, Defendants Greco and Okray also had the following exchange with analysts from Credit Suisse, RBC, and Citigroup, Inc. ("Citi") regarding Advance Auto's FY17 Guidance:

**[ANALYST]:** I just wanted to clarify. On the guidance, did you guys actually update the comps or EBIT margin targets you laid out previously?

**[GRECO]:** So let me step back from this one, Seth, and provide some context. Our approach is to provide guidance once a year. And consistent with our focus on operating for the long term, we're not going to provide regular updates as a matter of course. The long-term outlook for the industry remains very, very compelling for us, and we remain focused on executing the key elements of our transformation plan. *With respect to 2017, well, Q1 had a weak patch in the middle of the quarter that impacted the entire industry. We've actually seen improved trends over the last several weeks, and based on this, we expect a more normalized environment for the rest of the year. And our investments in the customer are clearly having an impact, and with our productivity initiatives kicking in, in the back half of the year, we feel all of this will drive significantly improved results.*

**[ANALYST]:** That's helpful. And then as you think about those long-term productivity targets that you updated today, does the timing change at all? So you shortened the time frame. Does that impact 2017 or more of the incremental savings in '18 and beyond?

**[OKRAY]:** Yes. I'll take that one. Yes, the timing from -- for the additional $250 million is primarily going to be in '18 and beyond. *As Tom stated, we're not going to change guidance in fiscal year '17. We're comfortable with the outlook for OI adjusted that we provided.*

\*       \*       \*

52

**[ANALYST]:** Just a quick clarification. Tom, did you just say you are comfortable with the OI guidance that you previously provided?

**[OKRAY]:** *Yes*. I mean, as a matter of course, we are going to update guidance -- we're going to give guidance once a year. We're going to give a fiscal year guidance. As Tom said, we're very comfortable with the industry dynamics. We're very comfortable with the strategic initiatives that we've got, availability, our digital online plans are accelerating, customer experience on the DIY side. *We expect to see these improvements in the second half of the year, and it gives us confidence in our ability to drive top and bottom line performance*.

*     *     *

**[ANALYST]:** I was wondering, are you -- with the trends that you're seeing to date following the end of Q1, are you seeing comps running in line with your annual guidance for comp? And I guess also, what's the comps lift benefit that you're getting from some of those, the availability test initiatives that you're rolling out? And how big is that right now as a percent of your store base?

**[GRECO]:** We're not going to comment specifically, Chris, on the quarter, I mean. *But we've seen a dramatic improvement in our comps, obviously, coming off a difficult Q1*. The -- your second question was on the -- repeat your second question?

178.    Also during the 1Q17 Conference Call, Greco had the following exchange with an

analyst:

**[ANALYST]:** Maybe to shift gears just a bit. You talked a lot about the soft patch in sales here in Q1, and by no means are you the only company, you had a competitor yesterday talking about it too. Just to maybe get your perspectives on what caused that, what was different this time around? As the business ticked up, was that a rebound, or is that more of a normalization?

**[GRECO]:** Yes, Brian. Again, I'll reiterate, we've looked at every number. The long-term variables are very positive. They point to the 3% to 4% we referenced earlier. *The short-term impact of what happened in February and March, we looked at all the factors you'd expect. We've looked at products, geographies, channels, customers, weather, tax. Everything we look at says that this was a blip, not a trend*.

179.    Despite missing their FY17 Guidance for the first quarter, which, as set forth below

in Section VI, partially revealed the falsity of their previous misstatements, Defendants continued

to mislead the market regarding the Company's ability to meet its comp store sales and operating

margin targets for 2017.   Indeed, while investors were disappointed in the comp store sales miss, the takeaway for analysts participating in the 1Q17 Conference Call was that the Company was standing by its FY17 Guidance.

180.   BTIG told investors in a report issued that same day that "[m]gnt reiterated 2017 guidance for 15-35 bp of EBIT margin expansion" and made clear that Defendants' full year 2017 guidance remained at 0% to 2% for comp store sales.   Likewise, JPMorgan reported that "the company reiterated it (sic) FY17 guidance of 0-2% comp. and 15-35 bps of operating margin expansion."   And Jefferies noted:

> AAP reported below-expectation comps & adj. EPS of -2.7% & $1.60. Despite the miss, management noted 'dramatically improved' comps in early Q2, consistent with peer feedback. Encouragingly, AAP raised the company's gross cost-savings target to $750M and accelerated the timeline to four years from five.

181.   The statements reaffirming the FY17 Guidance contained in ¶¶ 175-177 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) "we delivered positive sequential improvement in comparable store sales performance," (ii) "we remain confident with the progress we're making as we execute our plan and expect sales and customer momentum to continue with more operating leverage as we enter the back half of 2017," (iii) "[t]hat [FY17 Guidance] stands as we sit here today," (iv) "we're not going to change guidance in fiscal year '17.  We're comfortable with the outlook for OI adjusted that we provided," and (iv) "we've seen a dramatic improvement in our comps," Defendants had actual knowledge of at least the following:

    a) As of August 2016, gross sales for 2017 were forecasted to be negative 3% by the Finance Team. (¶ 145)

    b) As of Thanksgiving 2016, even the best Greco Forecasts were forecasting negative 1.5% gross sales for 2017. (¶ 146)

c)   As of December 2016, gross sales for 2017 were forecasted to be negative 4%-5% by the Finance Team. (¶ 150)

d)   Greco's personally created Claw Back Spreadsheet showed that all RVPs were in "Negative Comp Status" during 2016 and 2017. (¶ 140)

e)   The Company missed its operating margin AOP targets for 4Q16 by a greater amount than any previous quarter in the year, and missed its targets in 1Q17 and 2Q17 by double digit basis points. (¶ 142)

f)   According to FE 3, at the end of 2016, and in early 2017, "nobody was 'winning'" (i.e., hitting their sales targets). (¶ 142)

g)   According to FE 7, sales during 2016 were on a downward trend, and there were declines across the board. (¶ 142)

h)   FE 3 stated that the Company "was never on track" to hit the target it provided to Wall Street. (¶ 154)

i)   According to FE 10, to post a 0-2% comp store sales growth would have been "monumental." (¶ 149)

j)   The financial situation coming out of 1Q17 was a "disaster," prompting a Board meeting. At the time, AAP had missed 1Q17's sales plan by $25-$30 million, and was approximately $20 million behind plan for 2Q17. During the meeting, according to FE 8, the Board specifically asked Greco and Okray if they wished to update the Company's forecast, but they declined (¶¶ 142, 152)

k)   Defendants' forecasts to the market were not based on any reliable methodology but rather a top-down directive issued to RVPs that they knew could not be attained because of their own internal forecasts, and because of the integration and inventory issues that were weakening sales and operating margins, and layoffs and cost-cutting that had demoralized their sales force. (¶¶ 117-138)

182.   Moreover, none of the statements alleged in ¶¶ 175-177 above were accompanied by any meaningful cautionary language identifying the known risks of not meeting the comp store and margin forecasts that Defendants had outlined, including the risks created by the integration and inventory issues, layoffs and cost-cutting.

183.   In addition, Defendants' proffered reasons for the Company's poor performance in 1Q17 contained in ¶¶ 175-178 were materially false and misleading, omitted material facts, and lacked a reasonable basis when made. Specifically, at the time when Defendants told the market, among other things: (i) the poor performance was due to "winter related demand," "weather," and "short short-term headwinds that were not planned," (ii) that "[w]e've actually seen improved

trends over the last several weeks, and based on this, we expect a more normalized environment for the rest of the year," and "[e]verything we look at says that this was a blip, not a trend," Defendants knew or were severely reckless in not knowing at least the following:

a) Each fact that is contained in ¶ 181, above.

b) Gas and weather were not to blame, and "[w]hatever they said to Wall Street was not real." (¶ 154)

184.   Moreover, none of the statements alleged in ¶¶ 175-178 above were accompanied by any meaningful cautionary language identifying the known risks of not meeting the comp store and margin forecasts that Defendants had outlined, including the risks created by the integration and inventory issues, layoffs and cost-cutting.

### D.   Defendants Violated Item 303 of SEC Regulation S-K

185.   Defendants also violated their obligations pursuant to Item 303 of SEC Regulation S-K by failing to disclose known material adverse trends. More specifically, pursuant to Item 303 and the SEC's related interpretive releases thereto, an issuer is required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Such disclosures are required to be made by an issuing company in the "Management's Discussion and Analysis of Financial Condition and Results of Operations" ("MD&A") for every Form 10-Q filed by public companies.

186.   In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.

* * *

A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

187.    Furthermore, the 1989 Interpretive Release provided the following test to determine if disclosure under Item 303(a) is required:

Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

188.    AAP's 1Q17 Form 10-Q, which was filed with the SEC on May 24, 2017, and signed by Greco and Okray, omitted material information regarding known trends and uncertainties that Defendants were required to disclose pursuant to Item 303.  As alleged herein, Defendants failed to disclose declining sales and operating margins, which confirmed that Advance Auto's FY17 Guidance was unattainable. Because Defendants failed to make the requisite disclosures, they failed to comply with Item 303.

## VI.    THE RELEVANT TRUTH EMERGES: ALLEGATIONS OF LOSS CAUSATION

189.    Defendants' material misstatements and omissions complained of herein artificially inflated the market price of AAP's publicly traded common stock.  The artificial inflation in AAP's stock price was removed when the facts and risks misstated and omitted by Defendants were revealed to the market.  Such corrective information was disseminated to investors through public disclosures on May 24, 2017 and August 15, 2017.  Each such disclosure partially revealed relevant facts regarding the false and misleading nature of Defendants' material misstatements concerning the viability of the Company's FY17 Guidance and, in particular, its comp store sales growth

prospects and operating margins.  Each disclosure, more particularly described below, removed artificial inflation in the price of AAP's publicly traded stock, causing economic injury to Lead Plaintiff and other members of the Class.

> ### A.     May 24, 2017

190.    On May 24, 2017, AAP filed a Form 8-K, signed by Okray, with the SEC. In the press release attached to the Form 8-K, AAP reported its first quarter fiscal 2017 (ended April 22, 2017) financial and operational results ("1Q17 Press Release").  The 1Q17 Press Release reported disappointing results for the quarter, missing analyst expectations and falling far short of the guidance that the Company had issued just three months prior, in February 2017.

|  | February 21, 2017 FY17 Guidance | May 24, 2017 Actual Results | Delta |
|---|---|---|---|
| New Stores | 75 to 85 New stores (including Worldpac branches) | -- | |
| Comparable Store Sales | 0% to 2% | -2.7% | *-2.7% to -4.7%* |
| Adjusted Operating Income Rate | 15 to 35 basis points improvement | -288 basis points | -303 to -233 |
| Income Tax Rate | 37.5% to 38.0% | -- | |
| Integration & Transformation Expenses | $30 to $35 million (Approx.) | $12.8 million | $17.2-22.2 million |
| Capital Expenditures | $250 million (Approx.) | $65.3 million | $184.7 million |
| Free Cash Flow | Min. $400 million | Negative $30.2 million | *Negative $430.2 million* |
| Diluted Share Count | 74 million shares (Approx.) | 74 million | -- |

191.    As a direct and proximate result of these partial corrective disclosures  and/or materializations of foreseeable risks concealed by the Defendants' fraud, shares of the Company's stock fell $7.64 per share, or over 5.4%, to close on May 24, 2017 at $133.02 per share, on heavy trading volume.

192.     Analysts attributed the drop to the Company's lower than expected results, and expressed skepticism with the viability of the FY17 Guidance. Oppenheimer & Co. Inc. ("Oppenheimer"), for example, said the Company's results were "well below consensus," and, as result, "[w]e are sharply lowering our estimates following this morning's reported results." Stephens Inc. added, "our concerns about management achieving its margin improvement goals in the timeline provided were reinforced by this quarter's results."

193.     Guggenheim called the results "disappoint[ing]," and further wrote:

> Bottom line, although we continue to believe in the merits of AAP's turnaround, led by the company's highly experienced new leadership team, we expect 2017 to represent a transformational year as the company re-establishes a foundation for longer-term growth. As a result, we expect the meaningful 1Q shortfall to weigh on sentiment over the near-to intermediate-term as investors digest the broad-based implications of the miss as it relates to the cadence and magnitude of an eventual turnaround. We reiterate our NEUTRAL rating.

194.     AAP's failure to meet the FY17 Guidance, which was affirmed by Defendants, partially revealed the falsity of Defendants' forecasts.

195.     Nonetheless, as set forth above, in Section V, despite the Company's May 24, 2017 disclosures concerning comp store sales and operating margins for 2017 and the related stock price decline, the price of AAP common stock remained artificially inflated as Defendants continued to misrepresent and conceal material information from investors concerning the viability of the Company's FY17 Guidance, and its ability to deliver "positive" comp store sales and operating margins, and the true reasons for the poor performance in first quarter 2017.

**B.     August 15, 2017**

196.     On August 15, 2017, AAP filed a Form 8-K, signed by Okray, with the SEC. In the press release attached to the Form 8-K, AAP reported its second quarter fiscal 2017 (ended July 15, 2017) financial and operational results ("2Q17 Press Release").  With respect to the Company's

quarterly results, as well as outlook, the 2Q17 Press Release contained the following statements from Defendant Greco revising the Company's guidance for 2017:

> We delivered sales growth and continued to close the comp sales performance gap versus the industry in Q2 while more than doubling year to date Free Cash Flow. Our revised guidance for the year incorporates the impact of industry headwinds in the first half, which we expect to continue in the second half of the year and we are taking the appropriate actions to adapt to this environment. We've now assembled a world class leadership team that is executing our transformation plan to significantly drive growth and long term shareholder value.

197.   Additionally, the 2Q17 Press Release disclosed the details of Advance Auto's updated "2017 Full Year Assumptions" as follows:

| New Stores | 60-65 new stores |
|---|---|
| Comparable Store Sales | -3% to -1% |
| Adjusted Operating Income Rate | 200 to 300 basis points year over year reduction |
| Income Tax Rate | 37.5% to 38.0% |
| Integration & Transformation Expenses | Approximately $100 to $150 million |
| Capital Expenditures | Approximately $250 million |
| Free Cash Flow | Minimum $300 million |
| Diluted Share Count | Approximately 74 million shares |

198.   Also on August 15, 2017, Defendant participated in a conference call to discuss the Company's 2Q17 results and outlook ("2Q17 Conference Call"). During that conference call, Defendant Greco stated:

> We're still in the early phases of our turnaround and, as noted before, the historic lack of investment in the customer needed to be rectified. *We lacked the coherent strategy. Our frontline turnover was unacceptable. Our technology platforms were segregated and difficult to navigate. And our supply chain infrastructure was duplicative and siloed.*
>
> *All of this created a suboptimal experience for both customers and team members and was the primary reason our top line underperformed versus our competitive set by a wide margin for years.* Simply put, we were an easy share donor for our

competitors. Our new team has been acutely focused on changing this. Our focused investments have consistently enabled us to narrow the gap over the past 52 weeks, demonstrating that our elevated focus on the customer is driving desired outcomes.

While we're narrowing the competitive gap versus peers, which gives us tremendous confidence in our investment, we also recognize the short-term headwind the industry is facing and have factored this into our full year guidance. ***You saw our fiscal 2017 guidance revision in our press release today. Our revised full year guidance ranges from down 3% sales comp on the low end to down 1% comp on the high end.*** With regard to sales, there is little doubt the industry experienced a short-term drag on sales in the first half of 2017. This has been widely reported in both public company releases and syndicated data. While we don't think the softness is indicative of a longer-term trend, we do believe it's now prudent for us to plan for this softer industry backdrop to persist into the second half of 2017. As a result, we're moderating our growth expectations for 2017, as we do not believe we'll offset the first half sales softness in the back half nor do we believe industry growth rates will snap back to historical levels in half 2.

199.     Similarly, during 2Q17 Conference Call, Defendant Okray stated:

Given that half of the year is behind us and considering both current industry sales environment as well as the ramp time of actions we are taking to flow through to the P&L, we believe it is now prudent to revise our 2017 guidance. Considering our first half comp performance, as well as the outlook we have for overall industry growth in the back half, we have revised our full year comp expectations to now be between down 3% and down 1%.

Turning to operating profit. We have revised our adjusted OI margin expectations to be between 200 and 300 bps decrease versus prior year. The primary driver of the change is the leverage of fixed cost associated with the lower comp expectations. Also, contributing to the change is a 75 bps headwind related to noncash expenses from reducing our inventory significantly more than we planned at the beginning of the year. Excluding the impact of the noncash expenses from inventory reduction, the adjusted operating income margin expectation . . . would be a 125 to 225 bps decrease versus prior year.

200.     As a direct and proximate result of these partial corrective disclosures  and/or materializations of foreseeable risks concealed by the Defendants' fraud, shares of the Company's stock fell an additional $22.24 per share, or over 20.3%, to close on August 15, 2017 at $87.08 per share, again on heavy trading volume.

201.    Analysts attributed the drop to the Company's abrupt and dramatic change in 2017 guidance at such a late date.  Credit Suisse's commentary after the 2Q17 Conference Call was to the point:

> Still, there are questions; While AAP's Q2 was in line with market expectations, and ours, *it was the guidance that was more problematic, as the sales outlook was lowered and earnings improvement weighted to Q4, which wasn't fully appreciated previously*. Margin guidance was cut to -200-300 vs +15-35 bps. Most of the questions yesterday centered on why such a significant revision, and if it reflects higher costs, delayed productivity gains, or just a kitchen sink guide. *We believe that its primarily weaker sales as noted above*, along with the impact from inventory reduction efforts (75 bps now). *Either way, it's easy to question whether this turnaround is progressing, and difficult for investors to see that this is the bottom, pending margin stabilization in Q4. Until AAP can show that earnings can grow, it's likely stuck in the penalty box*.

202.    The analyst at RBC was no less critical of management's drastic shift on 2017 guidance and how it reflected on Advance Auto:

> Guidance may clear the deck, but *credibility damaged* – Advance lowered 2017 expectations to comps of (3%)-(1%) and an EBIT margin decline of 200-300 bps (or -125-225 bps excluding non-cash inventory reductions) from flat to +2% and EBIT expansion of +15-35 bps. The decline will primarily come from higher sales de-leverage, accelerated inventory reductions, and customer-facing investments. This outlook is fairly onerous and taken at face value, suggests significant margin deterioration in 2H17 despite $100mm of productivity gains. Our new estimates reflect these expectations. However, while *management has disappointed investors and hurt some of their initial credibility*, we would also note that when the CEO first took the helm, he effectively guided to negative comps of ~(5%) for the balance of 2016 and the company ended up with a (1%) in 3Q and +3% in 4Q. So, we think Advance may have used this release to "clear the deck" and, potentially, put in a bottom to earnings expectations.

203.    And Gordon Haskett said Advance Auto got "smoked like a Virginia ham," and questioned whether Greco's and Starboard's promised turnaround was still viable:

> Justice was swift and heavy- handed at Roanoke-based Advance Auto Parts (AAP) yesterday which got *smoked like a Virginia ham after the company outlined what now looks like a bleak 2017*. All this comes after AAP's new CEO – Tom Greco – laid out a five year plan last November that envisioned mid-single digit comps and at least 500 basis of margin expansion by 2021. *To say that the trip to 2021 got off on the wrong foot would be an understatement as both comps and margins will*

*be down this year*. Mind you, margins weren't particularly strong in 2016 so this is a case of "bad" being lapped by "worse." ***All this points to a turnaround story that is actually turning uglier and 2017 earnings of around $5***. This is less than half the amount that analysts were expecting two years ago.

204.    As a result of Defendants' misstatements and omissions, which were corrected by the disclosures discussed above, in total, the price of AAP common stock ended the Class Period at $87.08 per share, more than 50% below its Class Period high of $176.78 on December 7, 2016.

## VII.    ADDITIONAL ALLEGATIONS OF SCIENTER

205.    AAP and the Individual Defendants were active and culpable participants in the fraud, as evidenced by their knowing or reckless issuance of and/or control over AAP's and the Individual Defendants' materially false and misleading statements and omissions.  AAP, through its management and other senior level employees, and the Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public statements set forth in Section V above were materially false and misleading when made, and knowingly or recklessly participated or acquiesced in the issuance or dissemination of such statements as primary violators of the federal securities laws.  In addition to the facts alleged in Section IV above, regarding AAP's and the Individual Defendants' personal knowledge and/or reckless disregard of the materially false misrepresentations and omissions, AAP's and the Individual Defendants' scienter is evidenced by the specific facts discussed below.

### A.    Defendants' Actual Knowledge of the Company's Declining Sales and Margins in 2016 and 2017, and Negative Forecasts for 2017

206.    The following facts, when viewed individually or holistically, provide a strong inference that Greco, Okray and AAP knew and/or recklessly disregarded that they could not deliver "positive" comp store sales in 2017, that their FY17 Guidance was not attainable throughout the Class Period, and that their stated reasons for the Company's poor performance in 2017 were false.

207.   <u>Greco:</u> Throughout the Class Period, Greco was the President and CEO of Advance Auto. In that role, Greco directly participated in developing the Company's FY17 Guidance, including by commissioning and endorsing the alternative Greco Forecasts. Greco was also told: (i) as of August 2016, gross sales for 2017 were forecasted to be negative 3%; (ii) as of Thanksgiving 2016, the Greco Forecasts were negative 1.5%; and (iii) as of December 2016, gross sales for 2017 were forecasted to be negative 4% to 5%. (¶¶ 145-150)

208.   Greco was also personally aware of the Company's inability to meet the FY17 Guidance issued to the market, and that it lacked any foundation based on internal data, as is evidenced by at least the following additional facts regarding the Company's poor performance:

- Greco's personally created Claw Back Spreadsheet showed that all RVPs were in "Negative Comp Status" during 2016 and 2017. (¶¶ 149-150)
- Quarterly forecasts provided by the Finance Team showed that by 4Q16, the Company was missing its operating margin target (versus AOP) by the largest gap as compared to any point earlier in the year. Quarterly forecasts showed that AAP continued to miss its margin AOP by double digit basis points into 1Q17 and 2Q17. (¶ 142)
- The financial situation coming out of 1Q17 was a "disaster," prompting a Board meeting.  At the time, AAP had missed 1Q17's sales AOP by $25-$30 million, and was approximately $20 million behind plan for 2Q17. Defendants were specifically asked by the Board following 1Q17 whether they wished to updated their FY17 Guidance. Defendants declined to do so. (¶¶ 142, 152)
- Greco sent out quarterly e-mails to demand the sales personnel raise their numbers. (¶ 143)

209.   Greco was also acutely aware of the reasons for the Company's declining performance, including the failed integration of the AAP and Carquest IT systems, as evidenced by at least the following facts:

- All attendees of Integration Meetings, who reported back to Defendants, were well aware of how poorly the integration was going. (¶ 127)
- FE 10 attended a meeting with Greco in November 2016 to discuss why sales goals had not been met for November 2016. Each RVP told Greco the problem was

supply: store managers could not get their parts to customers in time, which in turn caused them to miss out on sales. During the call, Greco specifically referenced a report that showed FE 10's DCs had only a 70% probability of getting parts to the stores on time—well short of the Company's goal of 98%. (¶ 121)

- Inventory issues were repeatedly raised to Greco during quarterly review meetings in Roanoke, but Greco would deflect to unrelated topics—including cost cutting and layoffs—refusing to address the inventory concerns. (¶¶ 124-125)

- Under the direction of Jackson and Sherman, "the number one concern was the integration of Carquest." But after Greco took the helm, the Carquest issues were "not a priority," and "were not even in the top 5" issues Greco wanted to focus on. (¶ 129)

- The Company had decided by no later than Fall 2016 that the Red and Blue IT systems needed to be converted to a new, proprietary system. But, as of June 2017, the Company was "still formulating plans" for how to convert the systems, and the first conversions were not scheduled to begin until January 2018. (¶¶ 129-130)

- Integration issues were "all day, every day." (¶¶ 47, 127)

210.    What's more, Greco directed and/or was aware of the very cuts which led to a depleted and dejected work force, and further pressed down on the Company's sales and operating margins, as is evidenced by at least the following facts:

- Beginning in January or February 2017, AAP attempted to become "lean" by cutting the jobs of good, well-performing individuals.  (¶¶ 132-138)

- If a store was not on track to meet its target, the DMs would call the stores and send people home. (¶ 138)

- The Company cut roughly half of its Commercial Sales Managers in February or April 2017. (¶ 133)

- In or around June 2017, Greco fired several hundred DMs, and 22 of the 34 RVPs, over a conference call. (¶ 133)

211.    In addition, Greco consistently told investors he had his finger on the pulse of the Company. For example, Greco made the following statements during the Class Period:

- "We track how many customers we sell to every single week. So I know the absolute number of professional customers we're selling to by week, and we know exactly where our opportunities are. And we're getting the customers back we need to get back." (3Q16 Conference Call)

- "Well, first of all, we mentioned, right or wrong, we kind of landed on a small list of input metrics [e.g., order-to delivery time, turnover] not too long after I

got to AAP. And we said to the organization: we are not changing these. Even if they weren't perfect, we were not going to change those input metrics. We're going to look at them every single week, and we're going to go very deep, as opposed to this kind of wide swath -- one week, we're going to look at this, some other week, we're going to look at something else. We're looking at the same small list of metrics." (3Q16 Conference Call)

- "[W]e're delivering improved levels of execution throughout our supply chain. This includes higher fill rates from DCs, better in-stock rates in stores, and reduced order-to-delivery time to customers. All of this ladders up to providing a superior experience for our customers, and relative to where we were, these improvements are translating to accelerated growth." (4Q16 Conference Call)

- "So as I think I said before, we focused the entire field organization on input metrics. We hadn't been as focused on important input metrics like fill rate, like order-to-delivery time. Our turnover is down dramatically. I think that's been a big factor. We're delivering the part faster to the customer." (4Q16 Conference Call)

- "We know how many customers we're selling to every week. We know what our average sale per customer is on the professional side, and we know the parallel metrics on DIY, and we are seeing progress on pretty much every one of those metrics . . . . But overall we looked very closely at each region of the country every single week and we measured their performance against defined metrics on each of the items that I just mentioned." (4Q16 Conference Call)

212.    Okray: Throughout the Class Period, Okray was the EVP and CFO of Advance Auto. In that role, Okray directly participated in developing the Company's FY17 Guidance, including by commissioning and endorsing the alternative Greco Forecasts. After joining the Company, Okray was also told: (i) as of August 2016, gross sales for 2017 were forecasted to be negative 3%; (ii) as of Thanksgiving 2016, the Greco Forecasts were negative 1.5%; and (iii) as of December 2016, gross sales for 2017 were forecasted to be negative 4% to 5%. (¶¶ 145-150)

213.    Okray was also personally aware of the Company's inability to meet the FY17 Guidance issued to the market, and that it lacked any foundation based on internal data, as is evidenced by at least the following additional facts regarding the Company's poor performance:

- Quarterly forecasts provided by the Finance Team showed that by 4Q16, the Company was missing its operating margin target (versus AOP) by the largest gap as compared to any point earlier in the year. Quarterly forecasts showed that AAP

continued to miss its margin AOP by double digit basis points into 1Q17 and 2Q17. (¶ 142)

- The financial situation coming out of 1Q17 was a "disaster," prompting a Board meeting.  At the time, AAP had missed 1Q17's sales AOP by $25-$30 million, and was approximately $20 million behind plan for 2Q17. Defendants were specifically asked by the Board following 1Q17 whether they wished to updated their FY17 Guidance. Defendants declined to do so. (¶¶ 142, 152)

214.   Okray was also acutely aware of the reasons for the Company's declining performance, including the failed integration of the AAP and Carquest, as is evidenced by at least the following facts:

- All attendees of Integration Meetings, who reported back to Defendants, were well aware of how poorly the integration was going. (¶ 127)

- Under the direction of Jackson and Sherman, "the number one concern was the integration of Carquest." But after Greco took the helm, the Carquest issues were "not a priority," and "were not even in the top 5" issues Greco wanted to focus on. (¶ 129)

- The Company had decided by no later than Fall 2016 that the Red and Blue IT systems needed to be converted to a new, proprietary system. But, as of June 2017, the Company was "still formulating plans" for how to convert the systems, and the first conversions were not scheduled to begin until January 2018 (¶¶ 129-130)

- Integration issues were "all day, every day." (¶¶ 47, 127)

215.   What's more, Okray directed and/or was aware of the very cuts which led to a depleted and dejected work force, as is evidenced by at least the following facts:

- Beginning in January or February 2017, AAP attempted to become "lean" by cutting the jobs of good, well-performing individuals.  (¶¶ 132-138)

- If a store was not on track to meet its target, the DMs would call the stores and send people home. (¶ 138)

- The Company cut roughly half of its Commercial Sales Managers in February or April 2017. (¶ 133)

- In or around June 2017, Greco fired several hundred DMs, and 22 of the 34 RVPs, over a conference call. (¶ 133)

216.   Moreover, Greco's and Okray's statements and/or omissions of material information were made on behalf of the Company. Accordingly, their knowledge or deliberate

recklessness of the false and misleading nature of the alleged misstatements and omissions is imputed to and binding upon the Company.

### B.      The Fraud Concerns the Core of AAP's Operations

217.    The Company's comp store sales and operating margins are two of its most closely watched and highly touted metrics, and critical components of the Company's growth strategy—i.e., increasing sales and operating margins. Indeed, throughout the Class Period, Defendants regularly focused investors' attention on the Company's comp store sales and operating margins as evidence of AAP's purported turnaround and growth potential. Thus, the importance of comp store sales and operating margins to AAP's business and bottom line raises a strong inference that the Individual Defendants knew, or were reckless in not knowing or disregarding, that their statements about comp store sales growth and margin improvement were false and/or misleading or omitted material facts.

### C.      Defendants' High-Level Positions

218.    As the Company's top executives, Greco and Okray—the President and CEO, and EVP and CFO, respectively—controlled the Company's day-to-day operations and were informed of and responsible for monitoring AAP's comp store sales and operating margins.

219.    As the Company's CEO, Greco was responsible for all aspects of the Company's day-to-day operations. Greco was also a member of the Company's Board of Directors. Greco also certified the Company's financial reporting filed with the SEC, which included comp store sales and operating margins.

220.    As the Company's CFO, Okray was responsible for reviewing and approving all of AAP's financial reporting and for signing and approving each of the monthly press releases. Okray also certified the Company's financial reporting filed with the SEC, which included comp store sales and operating margin.

### D.     The Individual Defendants Controlled the Contents of the Company's Public Statements During the Class Period

221.    Because of their high-level positions, each Individual Defendant was also provided with, or had access to, copies of the documents alleged herein to be false or misleading prior to, or shortly after, their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information concerning the Company, the Individual Defendants knew or recklessly disregarded that the adverse facts alleged herein had not been disclosed to, and were being concealed from the public, and that the positive representations that were being made to investors, including the quantitative and qualitative statements concerning comp store sales and operating margin, were materially false, misleading, and incomplete.

222.    As a result, the Individual Defendants were responsible for the accuracy of AAP's corporate statements, and each is therefore responsible and liable for the representations contained therein or omitted therefrom.  AAP knowingly and/or recklessly made the materially false and/or misleading statements and omissions of material fact alleged herein based on the fact that Individual Defendants knew and/or recklessly disregarded that the Company's statements were materially false and/or misleading, and/or omitted material facts at the times that such statements were made.  Each of these Defendants was among the most senior executives of the Company throughout the Class Period and a member of the Company's management, and their knowledge may be imputed to the Company.

223.    Statements made by AAP and the Individual Defendants during the Class Period strongly and plausibly suggest each had access to the disputed information.  Indeed, the vast majority of Defendants' material misrepresentations and omissions explicitly or implicitly pertain to the FY17 Guidance, and could not have been made with any reasonable basis in fact, as the

Company in large part admitted in August 2017 when it disclosed that its FY17 Guidance was not attainable.

### E. Defendants Were Motivated by Financial Gain

224.    <u>Greco's Insider Sales:</u> Greco was financially motivated to commit securities fraud and realized substantial financial benefits from his personal sales of AAP stock at the same time that the Company misrepresented and concealed from investors the progress of the Carquest integration and the viability of the FY17 Guidance. More specifically, Greco sold 9,306 shares of AAP stock on or about April 13, 2017, at a price of $140.89, for total proceeds of $1,311,122 million.  This sale was suspiciously timed because it followed the Company's materially false and misleading FY17 Guidance, which was issued in February 2017.  Greco's sales were suspicious in amount because they represented 47.8% of his currently-held shares of AAP common stock at that time.  In addition, his sales were suspicious in amount because his $1.3 million in proceeds from the sales were approximately 1.18 times greater than Greco's 2017 total salary and bonus compensation ($1,100,008).

225.    <u>Defendants Were Motivated to Deliver Positive Returns on Starboard's Portfolio:</u> Buoyed by Defendants' false statements, by the end of 2016, AAP's stock price neared close to the $170 price at which Starboard had acquired AAP's shares.  Starboard's equity portfolio ended the year 10% up, an improvement over its embarrassing 2015 performance, when it lost 8% in overall value.   The propping up of Advance Auto's stock price, which was nearly 10% of Starboard's portfolio, had a material impact on Starboard's performance.

226.    <u>Defendants Were Motivated to Attract an Acquisition Partner:</u> Numerous market watchers commented on AAP's desire to find an acquisition partner prior to and during the Class Period. For example, shortly after Starboard disclosed its position in the Company, on December 15, 2015, StreetInsider.com published an article which stated:

> Advance Auto Parts (NYSE: AAP) is exploring a potential sale of the company after being approached by at least one possible buyer, according to a source familiar with the matter. Shareholders could expect to fetch up to $200 per share if a sale is successful, the source said. . . . Peer O'Reilly Automotive (NASDAQ: ORLY) is considered a natural buyer for Advance Auto Parts, and as recently as last week Wall Street analysts speculated that O'Reilly could be ready to announce a large transformational deal with Advance Auto Parts being the potential target."

227.    In a December 16, 2015 report, Gordon Haskett echoed the sentiment: "with Starboard's Jeff Smith now sitting in the boardroom and the company operating without a permanent CEO, it certainly seems possible that the company would be considering a sale."

228.    While the deal never materialized, rumors continued to surface during the Class Period. For example, in a January 12, 2017 CNBC Mad Money episode, host Jim Cramer argued "AAP is ready to catch a juicy takeover bid." "Given that there are just three major auto parts retailers out there, AAP is a natural target," Cramer said. "Whoever acquired them would instantly become the largest player in the space." Cramer specifically fingered O'Reilly as the more likely option (over AutoZone) because of its size and cleaner balance sheet. Defendants were therefore motivated to prop up AAP's stock price to present the Company as financially healthy and to maximize their profit in the event of an acquisition.

## F.    AAP Revised Its FY17 Guidance

229.    On August 15, 2017, the Company announced that it was revising its FY17 Guidance downward. The timing of the announcement—just six months after the original FY17 Guidance had been provided (on February 21, 2017), and three months after it had been unequivocally reaffirmed (on May 24, 2017)—was highly suspicious and raises a strong inference that Defendants actually knew that the FY17 Guidance was unattainable and had no basis in fact.

230.    In addition, the magnitude of the downward revisions—particularly with respect to comp store sales and operating income—also raises a strong inference of scienter:

|  | February 21, 2017<br>FY17 Guidance | August 15, 2017<br>Revised FY17 Guidance | Delta |
|---|---|---|---|
| New Stores | 75 to 85<br>New stores (including<br>Worldpac branches) | 60-65<br>New stores | 15-20<br>New stores |
| Comparable Store Sales | 0% to 2% | -3% to -1% | *-3%* |
| Adjusted Operating<br>Income Rate | 15 to 35<br>basis points<br>improvement | 200 to 300<br>basis points year over<br>year reduction | *215-335<br>basis point<br>reduction* |
| Income Tax Rate | 37.5% to 38.0% | 37.5% to 38.0% | -- |
| Integration &<br>Transformation<br>Expenses | $30 to $35 million<br>(Approx.) | $100 to $150 million<br>(Approx.) | *$70 to $115 million* |
| Capital Expenditures | $250 million<br>(Approx.) | $250 million<br>(Approx.) | -- |
| Free Cash Flow | Min. $400 million | Min. $300 million | *-$100 million* |
| Diluted Share Count | 74 million shares<br>(Approx.) | 74 million shares<br>(Approx.) | -- |

231.   The August 15, 2017 revision further confirmed that Greco's statements in November 2016 had no reasonable basis in fact. As it would later be revealed, AAP never expected "positive" comp store sales growth. In contrast, Defendants had repeatedly been told that forecasts for comp store sales and margin growth were negative for 2017.

### G.   Terminations of High-Ranking Personnel

232.   The terminations and resignations of high-ranking executives, including certain of the Individual Defendants, shortly before or shortly after the revelation of the alleged fraud, are further indicia of scienter.   On April 2, 2018, Okray abruptly resigned. Notably, Okray was the primary architect of the Company's "across-the-board" 3% sales growth mandate, and speaker of numerous false and misleading statements during the Class Period.

## VIII.   ADDITIONAL ALLEGATIONS OF CONTROL

233.   In addition to the facts detailed above in Section IV, Starboard and Smith had control, and actually exercised that control, over Advance Auto. Doing so, they culpably

participated in Defendants' fraud to benefit from the artificial inflation of AAP's stock, which salvaged Starboard's year-end performance numbers, saving the hedge fund from a consecutive year of embarrassingly poor results.

234.    Smith, dubbed the "most feared man in corporate America," is Managing Member, CEO, and Chief Investment Officer of Starboard, a New York-based hedge fund that habitually seizes control of large corporations in attempts to drive their stock prices. According to *BoardEx*, over the past six years, Starboard nominated 153 director candidates—successfully installing 86—at a wide variety of corporations, including Yahoo!, Darden, Office Depot, Inc., and The Brink's Company. For at least a few, e.g., Darden and Advance Auto, "Smith not only landed directorships for himself but he also became chairman of the board, giving him an important oversight role." The details of Starboard's and Smith's exercise of control over Advance Auto are as follows.

235.    In September 2015, when Starboard announced its 3.7% ownership position in AAP, an investment for $460 million that made Starboard one of the 10 largest AAP shareholders, Starboard's and Smith's plan to seize control of Advance Auto was underway.  Shortly thereafter, at an investor conference in Toronto, Starboard and Smith laid out their pitch to assume leadership of AAP in hopes of driving up the Company's stock price. In presenting, they endeavored to more than double AAP's then-current market price and characterized their own "Lead Activist Position."

236.    Over the next year, Starboard and Smith gained control of AAP's Management. To begin, barely a month after the Toronto conference on November 12, 2015, Starboard secured an "agreement" with the Company, the Starboard Agreement. The Starboard Agreement gave to Starboard and Smith the following rights, among others, to control the Company:

- ***Board of Directors***.  Under Items 1.01 and 5.02, Starboard appointed Smith as a director, as Chair of the Board's Nominating and Corporate Governance Committee, and as a member of the Board's Compensation and Finance Committees. Starboard became entitled to nominate two additional independent

73

directors. Further, AAP, itself, agreed to replace two additional directors designated by the Nominating and Corporate Governance Committee, chaired by Smith, at the annual meeting. To accommodate Smith, the size of AAP's Board increased from 12 to 13 members. The Agreement further ousted former CEO Darren R. Jackson. Under Item 8.01, the Company issued press releases to announce this "leadership transition."

- *Executive Leadership*.  Under Item 1.01, the Board's Nominating and Corporate Governance Committee, chaired by Smith, began a search for a CEO to succeed Jackson.

237.    Pursuant to the Agreement, Starboard and Smith gained the ability to control Advance Auto through new positions of power within the Company. Regarding AAP's Board of Directors, Starboard and Smith installed Smith as a director, Chair of the Board's Nominating and Corporate Governance Committee, and a member of the Board's Compensation and Finance Committees. They also installed three additional handpicked directors, who were well known to Starboard: Buss, Lee, and Slone. Regarding AAP's corporate leadership, with Smith at the helm of the Nominating and Corporate Governance Committee, the Starboard Defendants initiated the search for a new CEO.

238.    Flowing from that power grab, Smith ascended to the role of Chairman of the Board. Through the CEO search, Starboard and Smith installed Greco on April 11, 2016. Greco also became Advance Auto's President on August 14 of that year. Through their marionette CEO, on October 5, 2016, Starboard and Smith also handpicked a CFO, Okray. At the time of his nomination, Okray was quoted echoing Starboard's and Smith's Toronto conference presentation: "Advance is a well-positioned industry leader with an extraordinary opportunity to deliver improved performance."

239.    The resulting totem pole of power, as described by FE 9, an RVP, was Smith, then Greco, then Division SVPs, and so on. Smith's ascension was palpable. According to FE 12, also

74

an RVP, Smith had a presence in AAP's Raleigh office that was "unnerving" and in some way shocking, because he was so visible.

240.     According to FE 9, during the Class Period, Smith "manipulated everything in the background," and "Tom Greco [was] a puppet for Smith." FE 9's account was corroborated by FE 15, who said that, before and after Greco's onboarding, Smith pushed for significant cost cuts and got his way.

241.     What's more, it was widely understood that Starboard and Smith had handpicked the Company's new leadership regime. In a news release, Smith touted the steps Starboard had taken since disclosing its investment the previous November: "[s]ince joining the Board in November, Advance has taken important steps to generate shareholder value, including implementing a more field-centric organization and appointing a new chief executive officer."

242.     Consistently, the market recognized the shifting power paradigm. As the *Triangle Business Journal* explained, "[t]he board of directors at Advance Auto Parts is now firmly in the grips of activist hedge fund manager Jeffrey C. Smith, CEO and managing member of Starboard Value." Indeed, Smith's seat at the AAP table had been recognized almost immediately after Starboard's investment: a November 12, 2015 BBT report said that "[AAP's Board] has now partnered with Starboard Value in an effort to turn things around."

243.     Reinforcing Starboard's and Smith's hold of AAP, between May 13 and November 11 of 2016, Starboard purchased an additional *1,117,624 shares* of AAP, an investment valued at approximately *$180 million*, increasing its position in AAP by more than *60%*. As Starboard's ownership percentage increased, Starboard continued chipping away at requisite ownership thresholds for driving major Company actions. For example, at the Annual Meeting on May 17, 2017, the Company reduced the ownership threshold for calling a special meeting from 25% to

10% of shares outstanding and eliminated the 1-year holding requirement. This development would make it significantly easier for Starboard to call a special meeting by teaming up with other large-stake investors.

244.   What's more, Starboard and Smith actually exercised their control of Advance Auto. In November 2016, through Greco, Starboard and Smith introduced a five-year plan to reshape AAP. That plan had two corresponding benefits for Starboard and Smith. First, it served to distract the market from their stumbling start and lack of progress in the AAP turnaround. Second, it became a proxy through which Starboard and Smith were able to guide the Company's direction, allowing them to prop up AAP's stock—serving their own interests by salvaging Starboard's yearly performance—instead of addressing an ongoing integration crisis.

245.   More precisely, when Starboard purchased its $460 million stake in AAP, the Company was still facing significant complications in integrating GPI. Instead of addressing the complications, Starboard and Smith called for dramatic cost cuts to quickly juice margins. Yet, that plan backfired: the cuts caused a great decrease in the Company's sales, which became immediately apparent in the Company's internal data. That development did not change Starboard's and Smith's need to paint a rosy picture of their takeover for the sake of Starboard's year-end performance numbers.

246.   By way of further example, FE 9 said Smith personally brought in Boston Consulting Group ("BCG"), which ultimately blew $4 million in 2016 on a failed pilot program in Florida and Atlanta that attempted to slash costs when moving parts from one store to another. That program's strategy was to open the "view" so that each store could see the full inventories of the DCs, mini-warehouses, and sister stores. Yet, the strategy's cost was prohibitive, so it failed

miserably. FE 10 similarly recalled that Smith drove one supply chain problem pilot solution, which called for the creation of a "Cluster" and, after trials in Atlanta and Florida, also failed.

247.    Defendants were also motivated to attract an acquisition partner, as commented by numerous market watchers, including StreetInsider.com and Gordon Haskett. Although no such deal materialized, during the Class Period, rumors continued to surface in discussions by numerous market commentators. The prospect of an acquisition further motivated Defendants to prop up AAP's stock price to maximize their potential profits in the event a deal was struck.

248.    Defendants' fraud was successful, at least for Starboard and Smith in the short term. As the year closed, the optimistic, headline-grabbing promises of Greco and Okray buoyed AAP's stock price, which neared close to Starboard's acquisition purchase price of $170 per share. Starboard's equity portfolio ended the year 10% up, an improvement over its embarrassing 2015 performance, when it lost 8% in overall value.  The propping up of Advance Auto's stock price, which was nearly 10% of Starboard's portfolio, clearly helped Starboard achieve this result.

## IX.    CLASS ACTION ALLEGATIONS

249.    Lead Plaintiff brings this action on its own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons and entities who purchased the common stock of Advance Auto from November 14, 2016 through and including August 15, 2017 (as defined above, the "Class Period"), and were damaged thereby.  Excluded from the Class are:  (i) Defendants; (ii) members of the immediate families of the Individual Defendants and Smith; (iii) the Company's and Starboard's subsidiaries and affiliates; (iv) any person who is or was an officer or director of the Company or Starboard, or any of the Company's or Starboard's subsidiaries or affiliates during the Class Period; (v) any entity in which any Defendant has a controlling interest; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

250.     The members of the Class are so numerous that joinder of all members is impracticable.   During the Class Period, Advance Auto had more than 73 million shares of common stock outstanding and actively trading on the NYSE.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that the proposed Class numbers in the thousands and is geographically widely dispersed.   Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

251.     Lead Plaintiff's claims are typical of the claims of the members of the Class.   All members of the Class were similarly affected by Defendants' alleged conduct in violation of the Exchange Act as complained of herein.

252.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.   Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.

253.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   The questions of law and fact common to the Class include:

- whether Defendants violated the federal securities laws by their acts and omissions as alleged herein;
- whether Defendants made statements to the investing public during the Class Period that contained material misrepresentations or omitted material facts;
- whether and to what extent the market price of Advance Auto's common stock was artificially inflated during the Class Period because of the material misstatements and omissions alleged herein;
- whether Advance Auto and the Individual Defendants acted with the requisite level of scienter;

- whether the Section 20(a) Defendants were controlling persons of the Company and culpable participants in Defendants' fraud;

- whether reliance may be presumed; and

- whether the members of the Class have sustained damages as a result of the conduct complained of herein and, if so, the proper measure of damages.

254.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Furthermore, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## X.    THE FRAUD ON THE MARKET PRESUMPTION OF RELIANCE APPLIES

255.    At all relevant times, the market for Advance Auto's common stock was efficient for the following reasons, among others:

a)  Advance Auto's common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

b)  As a regulated issuer, Advance Auto filed periodic public reports with the SEC and the NYSE;

c)  Advance Auto regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)  Advance Auto was followed by multiple securities analysts employed by major brokerage firms who wrote reports, which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.  Indeed, more than 300 analyst reports on Advance Auto were published during the Class Period.

256.    As a result of the foregoing, the market for Advance Auto's common stock promptly digested current information regarding Advance Auto from all publicly available sources and reflected such information in the price of Advance Auto's stock.  Under these circumstances,

all purchasers of Advance Auto's common stock during the Class Period suffered similar injury through their purchase of Advance Auto's stock at artificially inflated prices and a presumption of reliance applies.

257.    Further, at all relevant times, Lead Plaintiff and other members of the putative Class reasonably relied upon Defendants to disclose material information as required by law and in the Company's SEC filings.  Lead Plaintiff and the other members of the Class would not have purchased or otherwise acquired Advance Auto's common stock at artificially inflated prices if Defendants had disclosed all material information as required. Thus, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its business, Lead Plaintiff and other members of the Class are entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153 (1972).

## XI.    THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ARE INAPPLICABLE

258.    The Private Securities Litigation Reform Act's statutory safe harbor and/or the "bespeaks caution doctrine" applicable to forward-looking statements under certain circumstances do not apply to any of the materially false or misleading statements alleged herein.

259.    None of the statements complained of herein was a forward-looking statement. Rather, each was a historical statement or a statement of purportedly current facts and conditions at the time each statement was made.

260.    To the extent that any materially false or misleading statement alleged herein, or any portion thereof, can be construed as forward-looking, such statement was a mixed statement of present and/or historical facts and future intent, and is not entitled to safe harbor protection with respect to the part of the statement that refers to the present and/or past.

261.    To the extent that any materially false or misleading statement alleged herein, or any portions thereof, may be construed as forward-looking, such statement was not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statement or portion thereof.  As alleged above in detail, given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by Defendants were not sufficient to insulate Defendants from liability for their materially false or misleading statements.

262.    To the extent that the statutory safe harbor may apply to any materially false or misleading statement alleged herein, or a portion thereof, Defendants are liable for any such false or misleading statement because at the time such statement was made, the speaker knew the statement was false or misleading, or the statement was authorized and approved by an executive officer of Advance Auto who knew that such statement was false or misleading.

## XII.    CAUSES OF ACTION

### COUNT I
#### For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Advance Auto and the Individual Defendants

263.    Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

264.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder on behalf of Lead Plaintiff and all other members of the Class, against Advance Auto and the Individual Defendants.

265.    As alleged herein, throughout the Class Period, Advance Auto and the Individual Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails and/or the facilities of national securities exchanges, made materially untrue statements of material fact and/or omitted to state material facts

necessary to make their statements not misleading and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Advance Auto and the Individual Defendants intended to and did, as alleged herein: (i) deceive the investing public, including Lead Plaintiff and members of the Class; (ii) artificially inflate and maintain the prices of Advance Auto's common stock; and (iii) cause Lead Plaintiff and members of the Class to purchase the Company's common stock at artificially inflated prices.

266.   The Individual Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged herein and having engaged in a plan, scheme, and course of conduct designed to deceive Lead Plaintiff and members of the Class, by virtue of having made public statements and prepared, approved, signed, and/or disseminated documents that contained untrue statements of material fact and/or omitted facts necessary to make the statements therein not misleading.

267.   As set forth above, Advance Auto and the Individual Defendants made the materially false and misleading statements and omissions and engaged in the fraudulent activity described herein knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

268.   In ignorance of the materially false and misleading nature of Advance Auto's and the Individual Defendants' statements and omissions, and relying directly or indirectly on those statements or upon the integrity of the market price for Advance Auto's common stock, Lead Plaintiff and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Lead Plaintiff and members of the Class would not have purchased the Company's common stock at such artificially inflated prices. As

set forth herein, when the true facts were subsequently disclosed, the price of Advance Auto's common stock declined precipitously, and Lead Plaintiff and members of the Class were harmed and damaged as a direct and proximate result of their purchases of the Company's common stock at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

### COUNT II
### For Violations of Section 20(a) of the Exchange Act
### Against the Section 20(a) Defendants

269.   Lead Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

270.   This Count is asserted pursuant to Section 20(a) of the Exchange Act, on behalf of the Lead Plaintiff and all other members of the Class, against Defendants Greco, Okray, Starboard and Smith (as defined above, the "Section 20(a) Defendants").

271.   As alleged above, the Company violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by making materially false and misleading statements and omissions in connection with the purchase or sale of Advance Auto's common stock and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period. This fraudulent conduct was undertaken with scienter, and Advance Auto is charged with the knowledge and scienter of each of the Individual Defendants who knew of or acted with deliberate reckless disregard of the falsity of the Company's statements and the fraudulent nature of its scheme during the Class Period.

272.   As set forth above, the Section 20(a) Defendants were controlling persons of the Company during the Class Period, due to their senior executive positions with the Company and their direct involvement in the Company's day-to-day operations, including their power to control or influence the policies and practices giving rise to the securities violations alleged herein, and

exercised the same.   As such, the Section 20(a) Defendants had regular access to non-public information about Advance Auto's business, operations, performance, and future prospects through access to internal corporate documents and information, conversations, and connections with other corporate officers and employees, attendance at management meetings and meetings of the Company's Board and committees thereof, as well as reports and other information provided to them in connection therewith.

273.    By virtue of the foregoing, the Section 20(a) Defendants each had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content of its public statements with respect to its operations, corporate governance, and compliance with regulators.

274.    The Section 20(a) Defendants were culpable participants in Advance Auto's fraud alleged herein, by acting knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful fraud and deceit upon Lead Plaintiff and the other members of the Class who purchased the Company's common stock during the Class Period.

275.    By reason of the foregoing, the Section 20(a) Defendants are liable to Lead Plaintiff and the members of the Class as controlling persons of the Company in violation of Section 20(a) of the Exchange Act.

## XIII.   PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff respectfully prays for judgment as follows:

1.   Determining that this action is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and appointing Kessler Topaz Meltzer & Check, LLP as class counsel pursuant to Rule 23(g);

2.   Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

3.   Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with prejudgment interest thereon;

4.   Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to, attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

5.   Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

Dated: January 25, 2019

Respectfully submitted,

By:   _/s/ P. Bradford deLeeuw_
**ROSENTHAL, MONHAIT**
**& GODDESS, P.A.**
P. Bradford deLeeuw (DE Bar ID #3569)
919 N. Market Street, Suite 1401
Wilmington, Delaware  19801
Telephone: (302) 656-4433
Facsimile: (302) 658-7567
Email: bdeleeuw@rmgglaw.com

*Liaison Counsel for the Class*

Sharan Nirmul (DE Bar ID #4589)
James P. McEvilly, III (DE Bar ID #4807)
Jonathan F. Neumann (*pro hac vice to be filed*)
Samuel C. Feldman (*pro hac vice to be filed*)
**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
280 King of Prussia Road
Radnor, Pennsylvania 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056
Emails: snirmul@ktmc.com

jmcevilly@ktmc.com
jneumann@ktmc.com
sfeldman@ktmc.com

*Counsel for Lead Plaintiff the Public Employees'
Retirement System of Mississippi and Proposed
Lead Counsel for the Class*

Blake A. Tyler (*pro hac vice to be filed*)
**GADOW TYLER, PLLC**
511 E. Pearl Street
Jackson, MS 39201
Telephone: (601) 355-0654
Facsimile: (601) 510-9667
Email: blake@gadowtyler.com

*Additional Counsel for Lead Plaintiff the Public
Employees' Retirement System of Mississippi*