IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| IN RE ADVANCE AUTO PARTS, INC., SECURITIES LITIGATION. | Civ. No. 18-212-RGA |

**MEMORANDUM OPINION**

P. Bradford deLeeuw, DELEEUW LAW LLC, Wilmington, Delaware; Sharan Nirmul, Jonathan F. Neumann, and Raphael Janove, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Stacey M. Kaplan, KESSLER TOPAZ MELTZER & CHECK, LLP, San Francisco, California. *Counsel for Lead Plaintiff*.


Samuel A. Nolen and Katharine L. Mowery, RICHARDS LAYTON & FINGER, P.A., Wilmington, Delaware; Douglas P. Baumstein, Claudine Columbres, Susan L. Grace, Camille M. Shepherd, Sequoia Kaul, WHITE & CASE LLP, New York, New York. *Counsel for Defendants*.

November 6, 2020
Wilmington, Delaware

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Lead Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi PERS") filed this securities action alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 by Defendants Advance Auto Parts, Inc., Thomas R. Greco, and Thomas Okray (the "Defendants"). (D.I. 46). Lead Plaintiff alleges that Defendants made materially false and misleading statements regarding projected 2017 sales and operating margins, and that these statements artificially inflated or maintained Advance Auto's stock price. (D.I. 73 at 18; D.I. 99 at 1).

Currently pending before the Court is Lead Plaintiff's Motion for Class Certification and Appointment of Lead Counsel. (D.I. 98). Pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, Lead Plaintiff seeks to certify a class on behalf of itself and all other persons and entities who purchased or otherwise acquired Advance Auto common stock between November 14, 2016 and August 15, 2017 (the "Class Period"). Pursuant to Rule 23(g), Lead Plaintiff further requests that the Court appoint Kessler Topaz Meltzer & Check as Class Counsel and deLeeuw Law as Liaison Counsel. Defendants oppose the Motion. (D.I. 128). Defendants have also filed a Motion for Leave to File a Surreply. (D.I. 150). The timing of that is, at best, odd, as it was filed three weeks after briefing was complete. For the following reasons, Lead Plaintiff's Motion (D.I. 98) is **GRANTED**, and Defendants' Motion (D.I. 150) is **DENIED** as it is untimely.

## I. DISCUSSION

To obtain class certification, a plaintiff must establish all four elements of Rule 23(a) along with one subpart of Rule 23(b). Fed. R. Civ. P. 23. Here, Defendants challenge only some of the requirements under Rule 23(a) and (b). Thus, the Court will start by addressing Defendants'

1

arguments under Rule 23(b), which provides context for understanding Defendants' arguments under Rule 23(a). The Court need not address the requirements Defendants do not challenge as they have been clearly satisfied for the reasons stated in Lead Plaintiff's briefs.

### A. Rule 23(b)(3)

Under Rule 23(b)(3)—the subpart pursuant to which Lead Plaintiff seeks class certification—the Court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members," and that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Defendants contend that Lead Plaintiff cannot satisfy the predominance requirement under Rule 23(b)(3), because: (i) it cannot establish class-wide reliance, and (ii) it did not show that damages can be measured on a class-wide basis. (D.I. 128). Each contention is addressed in turn.

#### 1. Reliance

Reliance "'is an essential element of the § 10(b) private cause of action' because 'proof of reliance ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011)). To establish reliance, Lead Plaintiff relies on the "fraud-on-the market" theory established by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1998). (D.I. 99 at 14). This theory allows a plaintiff to invoke a rebuttable presumption of reliance if the defendants' securities traded in an "efficient" market. *Amgen*, 568 U.S. at 461. "The fraud-on-the-market theory rests on the premise that certain well developed markets are efficient processors of public information," and therefore, "the 'market price of shares' will 'reflect all publicly available information.'" *Id.* (quoting *Basic*, 485 U.S. at

2

246). Absent a theory for presuming that the class relied on a defendant's alleged misrepresentations, individual issues of reliance will usually predominate. *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 608 (C.D. Cal. 2009).

To determine whether a market is efficient, courts consider the five *Cammer* factors, which are: (1) whether the security trades at a large weekly volume; (2) whether a significant number of analysts follow and report on the security; (3) whether the security has market makers; (4) whether the company is eligible to file an S-3 registration statement; and (5) whether empirical facts show a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the security's price. *See Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989); *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 633 n. 14 (3d Cir. 2011) (recognizing the *Cammer* factors), *abrogated on other grounds by Amgen*, 568 U.S. at 465. Courts have also considered the three *Krogman* factors, which are: (1) the market capitalization of the company; (2) the bid-ask spread of the security; and (3) the size of the public float. *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tx. 2001); *see also DVI*, 639 F.3d at 633 n. 14.

Defendants concede that Lead Plaintiff has established four of the five *Cammer* factors and all three *Krogman* factors. (D.I. 128). They dispute only whether Lead Plaintiff has satisfied the fifth *Cammer* factor. (*Id*. at 6). Because my conclusions regarding market efficiency rest on the strength of the other factors, I must briefly touch on each before I address the parties' dispute over the fifth *Cammer* factor.

      **a.**    **The Undisputed Factors**

All four undisputed *Cammer* factors weigh in favor of finding market efficiency. Under the first, Advance Auto stock had an average weekly trading volume of over 8.7% of shares outstanding. (D.I. 99 at 15). An average weekly trading volume of 2% or more of the outstanding

shares justifies "a strong presumption that the market for the security is an efficient one." *Cammer*, 711 F. Supp. at 1286. As to the second and third, Advance Auto had 26 analyst and 280 active market makers. (D.I. 100-1 ¶¶ 28, 32-34). These factors have been satisfied with far fewer analysts and market makers. *See Villella v. Chem. & Mining Co. of Chile*, 333 F.R.D. 39, 54 (S.D.N.Y. 2019) (second factor satisfied based on only 15 analysts); *Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 83 (D.N.J. 2019) (third factor satisfied based on only 17 market makers). As to the fourth factor, Advance Auto met the requirements for issuing securities pursuant to a Form S-3 throughout the class period. (D.I. 100-1 ¶ 46).

Each of the *Krogman* factors also weighs in favor of finding market efficiency. First, Advance Auto's market capitalization during the class period was greater than 69.3% and 92.2% of NYSE-listed and NASDAQ-listed stocks. (D.I. 100-1 ¶ 55). A market capitalization well above the median for companies trading on a major exchange weighs in favor of finding market efficiency. *DVI*, 249 F.R.D. at 212. Second, the average and median bid-ask spreads on Advance Auto's stock were smaller than those of randomly sampled stocks listed on the NYSE. (D.I. 100-1 ¶ 56). A small bid-ask spread indicates that trading in the stock is inexpensive, which suggests efficiency. *Krogman*, 202 F.R.D. at 478. Finally, Advance Auto's public float—i.e., the percentage of a security outstanding held by the public—was 95.7% of Advance Auto shares outstanding during the Class Period. (D.I. 100-1 ¶ 57). A large public float does not present the same concerns as a small public float, where more insiders hold stocks. The prices of stocks that have small public floats are less likely to reflect all available information, because insiders may trade on private information. *Krogmant*, 202 F.R.D. at 478.

Finally, in addition to the *Cammer* and *Krogman* factors, the Court notes that Advance Auto's common stock was actively traded on the NYSE and NASDAQ. (D.I. 100-1 ¶¶ 33-34).

"[T]he listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency." *DVI*, 639 F.3d at 634.

### b. *The Fifth Cammer* Factor

Defendants contend that Lead Plaintiff cannot prove market efficiency, because the event study submitted by Lead Plaintiff's expert, Dr. Zachary Nye, in support of the fifth factor is methodologically unsound. (D.I. 128 at 7). The Third Circuit stated that the fifth factor is "normally the most important factor in an efficiency analysis." *DVI*, 639 F.3d at 634. But the *Cammer* factors are an "analytical tool" and not a "checklist." *Hull v. Global Dig. Sol., Inc.*, 2018 WL 4380999, at *6 (D.N.J. Sept. 14, 2018). Thus, as the Third Circuit also stated, the utility of the *Cammer* factors "depend[s] on the circumstances." *DVI*, 639 F.3d at 634 n. 16.

Accordingly, "[c]ourts have rejected the idea that the fifth *Cammer* factor is necessary to establish market efficiency." *W. Palm Beach Police Pension Fund v. DFC Global Corp.*, 2016 WL 4138613, at *12 (E.D. Pa. Aug. 4, 2016); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 441–42 (D. Ariz. 2019) ("Plaintiffs may prove market efficiency without satisfying the fifth *Cammer* factor"); *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 86 (S.D.N.Y. 2015) ("[W]hether a plaintiff can satisfy *Cammer* 5 is not dispositive").

Because Lead Plaintiff has made a strong showing on the other seven factors, and Defendants do not dispute that showing, the Court concludes that Plaintiff has shown market efficiency and is entitled to the *Basic* presumption of reliance. *Di Donato*, 333 F.R.D. at 441–42 (finding that plaintiff met its burden of showing market efficiency because defendants did not dispute the first four *Cammer* factors or the *Krogman* factors); *Angley v. UTi Worldwide Inc.*, 311 F. Supp. 3d 1117, 1121 (C.D. Cal. 2018) (same).

The Court declines to resolve the disputes over the fifth *Cammer* factor because it is not necessary to reach the conclusion that Advance Auto traded in an efficient market. *See Waggoner v. Barclays PLC*, 875 F.3d 79, 91, 98-99 (2d Cir. 2017) (a district court that "declined to determine whether *Cammer* 5 was satisfied" acted within its discretion "in finding an efficient market based on the remaining seven factors"); *Pirnik v. Fiat Chrysler Auto., N.V.*, 327 F.R.D. 38, 45 (S.D.N.Y. 2018) ("As Plaintiffs easily satisfy the first four *Cammer* factors, the Court need not and does not analyze the fifth *Cammer* factor, which asks for direct evidence of price impact."); *Carpenters Pension*, 310 F.R.D. at 86 (finding "no reason to burden the court with review of an event study and the opposing expert's attack of it" when the other factors demonstrated that the market was efficient).

### c. Rebuttal

"A defendant can rebut the *Basic* presumption by providing direct evidence that demonstrates that the [alleged misrepresentations] did not impact the security's price." *West Palm Beach*, 2016 WL 4138613, at *14. Defendants attempt to rebut the presumption by showing that the alleged misrepresentations did not cause Advance Auto's stock price to rise at the time of the disclosure. (D.I. 128 at 17). According to Defendants' expert, Dr. Glenn Hubbard, the alleged misrepresentations instead either caused a decrease in Advance Auto's stock price or no change at all.[1] (*Id.* at 15-16). But Defendants' rebuttal evidence is lacking in two respects.

First, Defendants incorrectly assume that the alleged misrepresentations must cause the stock price to increase at the time of the disclosure in order for Lead Plaintiff to show price impact.

---

[1] Specifically, Dr. Hubbard opined that the November 14, 2016 disclosure caused no statistically significant price movement, the February 2, 2017 disclosures caused either a decrease in stock price or no change at all, and one of the four disclosures on May 24, 2017 caused a decline in stock price, while the other three caused no statistically significant change at all. (D.I. 128 at 15-17).

6

On the contrary, courts have consistently held that alleged misrepresentations can "have price impact not because they introduce inflation into a share price, but because they 'maintain' it."[2] *Ark. Teacher Ret. Sys. v. Goldman Sachs Group, Inc.*, 955 F.3d 254, 264 (2d Cir. 2020); *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *12 n. 8 (D.N.J. Aug. 31, 2015) ("[I]t . . . does not necessarily follow from the mere absence of a statistically significant change in the stock price that there was no price impact. It is possible that those statements assisted in maintaining an inflated price."). As a result, courts have held that "the lack of price movement on the dates of the alleged misrepresentations does not rebut the *Basic* presumption." *Waggoner*, 875 F.3d at 104; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016) ("[D]efendants cannot avoid liability . . . merely because the misstatement is not associated with an uptick in inflation.").

Second, Defendants only address price impact at the time of alleged misrepresentation and not price impact at the time of the corrective disclosure. "The movement of a stock price immediately after a false statement often tells us very little about how much inflation the false statement caused." *Glickenhaus & Co. v. Household Intern., Inc.*, 787 F.3d 408, 415 (7th Cir. 2015). For example, "a stock can be inflated even if the price remains the same or declines after a false statement because the price might have fallen even more" absent the false statement. *Id*. Thus, "[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed." *Id*.; *see also Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016) (explaining that price impact is not measured solely by changes on the date of a misstatement; it can also be measured by a decline in price on the date the

---

[2] Lead Plaintiff's complaint alleges price maintenance. (*See*, *e.g*., D.I. 46 ¶ 265 (alleging that "Advance Auto and the Individual Defendants intended to and did, as alleged herein . . . artificially inflate and maintain the prices of Advance Auto's common stock")).

7

truth is revealed). "If a corrective disclosure decreases a defendant's share price on a given date, the plaintiffs have a claim for securities fraud." *Arkansas Teacher*, 955 F.3d at 270.

Here, the complaint alleges and Plaintiff's expert opined that Advance Auto's stock price experienced statistically significant declines following each of the alleged corrective disclosures. (D.I. 100-1 ¶¶ 49-53; D.I. 141-3 ¶¶ 52, 61). Defendants do not address the decline in stock price at the time of the corrective disclosures. Thus, Defendants have failed to rebut the *Basic* presumption. *See Hatamian*, 2016 WL 1042502, at *7 (holding that "Defendants' evidence that there was no statistically significant price impact on certain misstatement dates cannot alone [rebut the presumption] where, as here, expert reports show statistically significant price impacts on each disclosure date.").

### 2. Damages Model

Defendants argue Lead Plaintiff cannot meet the predominance requirement because it has not provided a damages model showing that damages can be calculated on a class-wide basis. (D.I. 128 a 18). Even if true, "[c]lass certification will not necessarily be defeated where there are individual issues with respect to the calculation of damages." *In re Novo Nordisk Sec. Litig.*, 2020 WL 502176, at *9 (D.N.J. Jan. 31, 2020). "Indeed, in securities cases such as this one where all other issues are provable by common evidence, denial of class certification solely on the basis of individual damages calculations would be 'an abuse of discretion.'" *Sterling Heights*, 2015 WL 5097883, at *13 (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374–75 (3d Cir. 2015)). Because the Court finds that common issues predominate over all other issues of law and fact in this case, the Court need not assess the validity of Lead Plaintiff's damages model at this stage. Accordingly, Lead Plaintiff has satisfied the predominance requirement under Rule 23(b). *See Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 476 (D. Del. 2014) (predominance satisfied

where the "only issue requiring individual treatment will be the computation of damages for the Class members").

### A.     Rule 23(a).

Under Rule 23(a), a plaintiff must show that: (1) the class is so numerous joinder of all the members is impracticable; (2) there are questions of law or fact common to the class; (3) the parties' claims or defenses are typical of the class; and (4) the representative parties fairly and adequately protect the interests of the class.  *Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 527 (3d Cir. 2004).  These four prerequisites are commonly referred to as (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation.  *In re Heckmann Corp. Sec. Litig*., 2013 WL 2456104, at *8 (D. Del. June 6, 2013).  Defendants challenge only the typicality and adequacy requirement under Rule 23(a).  Each challenge is addressed in turn.

#### 1.     Typicality

A proposed class representative is not typical under Rule 23(a)(3) if "the representative is subject to a unique defense that is likely to become a major focus of the litigation."  *In re Schering Plough Corp. ERISA Litig*., 589 F.3d 585, 598 (3d Cir. 2009) (quoting *Beck v. Maximus, Inc*., 457 F.3d 291, 301 (3d Cir. 2006)).  Defendants contend that Lead Plaintiff is subject to a unique defense because it does not rely on the efficiency of the market to make investment decisions.  Instead, Plaintiff "grants its 'active' investment advisors complete discretion to purchase or sell securities on its behalf," and at least one of those advisors used its own "valuation analyses" to make investment decisions.  (D.I. 128 at 21-22).

A class representative's use of an investment advisor, even one that has complete discretion, does not automatically render it atypical.  *See Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp*., 762 F.3d 1248, 1259-60 (11th Cir. 2014) (rejecting

9

argument that representative was atypical because it used an investment advisor); *Beaver Cty. Emps.' Ret. Fund v. Tile Shop Holdings, Inc.*, 2016 WL 4098741, at *5 (D. Minn. July 28, 2016) (using an investment advisor who "had full discretion" to manage plaintiffs' assets "does not, without more, preclude [plaintiffs from] serving as class representatives"). Indeed, courts have recognized that large institutional investors are likely to rely on investment advisors, "[a]nd yet both Congress and the courts have recognized that these sorts of investors are generally preferred as class representatives in securities litigation." *Local 703*, 762 F.3d at 1260; *see also DVI*, 639 F.3d at 640 n. 25 & 641 (noting that institutional investors, who usually conduct their own "careful research," are "preferred as class representatives").

In addition, the fact that Lead Plaintiff's investment advisor used its own valuation analysis—to "[p]urchase stocks at a discount" and "sell[] stocks as they approach full valuation" (D.I. 128 at 22)—does not necessarily mean that the advisor did not rely on the integrity of the market in making purchasing decisions. As the Supreme Court explained, even a value investor, "who believes that certain stocks are undervalued or overvalued and attempts to 'beat the market'… implicitly relies on the fact that a stock's market price will eventually reflect material information—how else could the market correction on which his profit depends occur?" *Halliburton*, 573 U.S. at 273.

Finally, Defendants contend that Lead Plaintiff could not have relied on the efficiency of the market, because one of its investment advisors "saw through the fraud." (D.I. 128 at 22 - 24). But the statements themselves on which Defendants rely show that the investment advisor did not see through the fraud. The investment advisor said, "I wouldn't be too aggressive *in case* this quarter was a head fake." (D.I. 128 at 23 (emphasis added)). The advisor did not say, "*because* this quarter was a head fake." Thus, the advisor was merely hedging his bets. In that same email,

the advisor added, "I have increased confidence that AAP's earnings growth is improving," although he predicted the path would not be linear "given all the moving pieces." (*Id*.). When Advance Auto released its corrective disclosures, the advisor learned his confidence was misplaced. He noted that, "I underreacted to the early signs of disappointment . . . and it's costing us." (D.I. 128 at 23). An investor who saw through the fraud is unlikely to have lost money from underreacting. In other words, the general skepticism or caution the advisor demonstrated is not the same as seeing through the fraud. Accordingly, Defendants have not shown that Lead Plaintiff is subject to a unique defense. Lead Plaintiff has satisfied the typicality requirement of Rule 23(a)(3).

### 2. Adequacy

To meet the adequacy requirement under Rule 23(a), the district court must find that (1) the class representatives' interests do not "conflict with those of the class," and (2) the proposed class counsel are "capable of representing the class." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 185 (3d Cir.2001).

Defendants contend that Lead Plaintiff's interests conflict with the class because its counsel, Kessler Topaz Meltzer & Check, donated $141,000 to the electoral campaigns of Jim Hood, the Mississippi Attorney General who exercised his authority to retain Kessler Topaz as outside counsel in this lawsuit. (D.I. 128 at 26 - 27). In general, a plaintiff "that was willing to base its choice of class counsel on political contributions instead of professional considerations … would 'not fairly and adequately protect the interests of the class.'" *In re Cendant Corp. Litig.*, 264 F.3d 201, 269 (3d Cir. 2001). But Defendants must do more than make speculative allegations of impropriety. Defendants must present actual evidence showing that the contributions influenced the Lead Plaintiff's selection process. *Cendant*, 264 F.3d at 269. Here, Defendants have done no

11

more than point to legal contributions to an election campaign and the Mississippi Attorney General's routine authority to accept his department's recommendation that a particular law firm be retained to pursue a particular claim. (D.I. 128 at 26-27; *see also* D.I. 129-1, Ex. 11 at 69:3-15, 119:5-120:7 (explaining Lead Plaintiff's selection process)). These facts do not by themselves show a conflict of interest. *See Cendant*, 264 F.3d at 269 (rejecting pay-to-play argument because "[a]llegations of impropriety are not proof of wrongdoing"); *Medoff v. CVS Caremark Corp.*, 2016 WL 632238, at *3 (D.R.I. Feb. 17, 2016) (rejecting pay-to-play argument because "speculative or hypothetical conflicts do not defeat Rule 23's adequacy requirement").

Finally, Defendants contend that Lead Plaintiff is inadequate, because it does not actively control and direct the litigation or have a basic understanding of the claims and defenses. (D.I. 128 at 28-30). But the record does not support Defendants' contention. A careful reading of the testimony from Lead Plaintiff's representative demonstrates that Lead Plaintiff understands its duties and responsibilities as class representative, has taken an active role in managing the litigation, and understands the core allegations and claims. (*See* D.I. 129-1, Ex. 11 at 41:24-43:18, 47:22-48:7, 54:8-21, 56:3-9, 57:1-4, 66:10-19, 68:14-69:15, 113:11-114:8, 118:7-120:7, 128:12-129:5, 130:17-131:15, 152:25-153:4, 157:3-158:24). This more than satisfies the requirements for adequacy. *Roofer's Pension*, 333 F.R.D. at 77 ("It is well-settled that 'a class representative need only possess a minimal degree of knowledge necessary to meet the adequacy standard.'" (quoting *City Select Auto Sales, Inc. v. David Randall Assocs., Inc.*, 296 F.R.D. 299, 316 (D.N.J. 2013)).

### B. Class Definition

Defendants claim the proposed class definition "improperly includes shareholders that purchased before 5:39 p.m. on November 14, 2016, when the first alleged misstatement was made . . . and after 6:30 a.m. on August 15, 2017, when AAP made the last alleged corrective disclosure."

(D.I. 128 at 30).  But Defendants have not explained how the precise hour the class period started and ended relates to any Rule 23 requirements and the Court cannot think of one.  Indeed, at least one other court has stated that "the start [and end] date of the class period is unrelated to the Rule 23 requirements." *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *19 (S.D.N.Y. Aug. 13, 2018). Accordingly, the Court will not address this argument in this context.

### C.  Appointment of Class Counsel

On November 2, 2018, Judge Noreika preliminarily appointed lead counsel Kessler Topaz Meltzer & Check, LLP and liaison counsel Rosenthal, Monhait & Goddess, P.A. as class counsel. (D.I. 44).  Having considered the relevant factors invoked by Rule 23(g), and absent any objection by Defendants or any class member, the Court concludes that lead counsel fairly and adequately represent the interests of the class and accordingly finalizes that appointment.

## II.  CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification, appointment of class representatives, and appointment of class counsel (D.I. 98) is granted.  The proposed order (D.I. 98-2) will be entered.